


James P. Baker (SBN: 096302)
jpbaker@winston.com
Nisha S. Patel (SBN: 268234)
napatel@winston.com
WINSTON & STRAWN LLP
101 California Street
San Francisco, CA 94111-5802
Telephone: (415) 591-1000
Facsimile: (415) 591-1400

Attorneys for Plaintiff

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

WILLIAM FIKE,

Plaintiff,

v.

THE OKONITE COMPANY, INC. EMPLOYEES' STOCK OWNERSHIP PLAN; ADMINISTRATIVE COMMITTEE FOR THE OKONITE COMPANY, INC. EMPLOYEES' STOCK OWNERSHIP PLAN; THE OKONITE COMPANY, INC.; DAVID J. SOKIRA, and DOES 1-10

Defendants.

**Case No.** CV 11 3277

**COMPLAINT**

Comes now the plaintiff, WILLIAM FIKE ("Plaintiff" or "Mr. Fike"), by his attorneys, James P. Baker, Nisha S. Patel and Winston & Strawn, LLP, and complaining against the Defendants, he states:

**JURISDICTION AND VENUE**

1. Jurisdiction of the court is based upon the Employee Retirement Income Security Act of 1974; 29 U.S.C. § 1001 *et seq.* ("ERISA"); and in particular, ERISA section§ 502(e)(1), 502(f) and 510; 29 U.S.C. §§ 1132(e)(1), 1132(f) and 1140. Those provisions give the district court jurisdiction to hear civil actions brought pursuant to ERISA section 502(a)(1)(B); 29 U.S.C. § 1132(a)(1)(B); ERISA section 502(a)(2); § 502(a)(3); 29 U.S.C. § 1132(a)(3); 29 USC



Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

§ 1132(a)(2) and ERISA section 510, 29 U.S.C. § 1140. This action is also properly before this court pursuant to 28 U.S.C. § 1331, which gives the district court jurisdiction over actions that arise under the laws of the United States.

2. Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(b), and ERISA section 502(e)(2), 29 U.S.C. § 1132(e)(2).

3. Intradistrict Assignment: This civil action should be assigned to the San Francisco Division. Plaintiff resides in San Francisco and the acts or omissions giving rise to Plaintiff's complaint occurred in San Francisco.

**NATURE OF ACTION**

4. Mr. Fike brings five claims arising under ERISA, as amended, against Defendants. The Okonite Company, Inc. Employees' Stock Ownership Plan ("the Plan"), the Administrative Committee for the Okonite Company, Inc. Employees' Stock Ownership Plan ("Plan Committee"), the designated Plan Administrator of the Plan and David J. Sokira, as Chairman of the Plan Committee (collectively the "Plan Defendants") are alleged in Count One to have improperly refused to pay to Plaintiff his Plan benefits when due in violation of ERISA section 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B). Count Two seeks recovery for a breach of fiduciary duty under ERISA section 404(a)(1), 29 U.S.C. § 1104(a)(1). It alleges that Defendants have refused to administer the Plan in accordance with its terms and have wrongfully denied Mr. Fike his Plan distribution. It further alleges that Defendants' summary denial of Mr. Fike's request for a Plan distribution based on medical necessity and financial hardship was unlawful and an abuse of discretion.

5. Count III, "Prohibited Transaction," alleges that Defendants' failure to distribute Mr. Fike his Plan benefits allowed Defendants to cause the Plan to engage in a transaction that personally benefitted Defendants. *See* 29 U.S.C. § 1106. Count IV alleges that Defendants intentionally interfered with Mr. Fike's rights to Plan benefits in violation of 29 U.S.C. § 1140 because of his sexual orientation and because he suffers from HIV/AIDS. Count V seeks a $110 per day monetary penalty under ERISA section 502(c)(1), 29 U.S.C. § 1132(c)(1) due to Defendants' deliberate decisions to ignore Mr. Fike's requests for information relevant to his claim, dated April 18, 2011 and May 4, 2011.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

## THE PARTIES

### A. PLAINTIFF

6. Plaintiff is a former employee of The Okonite Company, Inc. ("Okonite Company"). He was employed with the Okonite Company from 1982 to 1989.

7. Plaintiff is a current Plan participant within the meaning of ERISA section 3(7), 29 U.S.C. § 1002(7).

8. Plaintiff resides in San Francisco, California.

9. The acts or omissions relevant to Plaintiff's claims took place within the Northern District of California.

### B. DEFENDANTS

10. The Defendant Okonite Company, Inc. Employees' Stock Ownership Plan as Amended Effective January 1, 1997 ("Plan") is a qualified pension plan within the meaning of ERISA section 3(2)(A), 29 U.S.C. § 1002(2)(A). A true and correct copy of the "Plan" is attached to this Complaint as Exhibit A.

11. The Amendments to The Okonite Company, Inc. Employees' Stock Ownership Plan ("Amendments"), were effective January 1, 2002, January 1, 2007, July 1, 2007, and January 1, 2009, and amended sections 2, 6.1, 7.1, 8.2, 8.14, 12.2 and the Minimum Distribution Requirements of the Plan. A true and correct copy of the Amendments are attached to this Complaint as Exhibit B.

12. The Amendment to The Okonite Company, Inc. Employees' Stock Ownership Plan, ("January 1, 2005 Amendment") at issue in this Complaint was effective January 1, 2005 and amended section 8.3 of the Plan. A true and correct copy of the "January 1, 2005 Amendment" is attached to this Complaint as Exhibit C.

13. Defendant Administrative Committee for the Okonite Company, Inc. Employees' Stock Ownership Plan ("Administrative Committee") is the actual and/or de facto Plan administrator within the meaning of ERISA section 3(16)(A), 29 U.S.C. § 1002(16)(A). The Administrative Committee's address for purposes of filings under the terms of the Plan are to be sent to: Plan Committee, c/o David J. Sokira, Secretary, The Okonite Company, Inc., 102 Hilltop Road, Ramsey, New Jersey 07446.

14. At all times relevant hereto, the Okonite Company was doing business throughout the United States and can be found within the Northern District of California.

15. At all times relevant hereto, The Okonite Company, Inc. Employees' Stock Ownership Plan had participants, like Mr. Fike, who lived in this district and as such, the Plan can be found within the Northern District of California.

16. The Okonite Company is incorporated in New Jersey with a principal place of business at 102 Hilltop Road, Ramsey, New Jersey 07446. The Okonite Company was at all relevant times the sponsor of the Plan within the meaning of ERISA section 3(16)(B), 29 U.S.C. § 1002(16)(B), and functioned as a Plan fiduciary within the meaning of ERISA section 3(21), 29 U.S.C. § 1002(21), as the Okonite Company's Board appoints members of the Plan's Administrative Committee and has a fiduciary duty to monitor the Administrative Committee's performance.

17. Defendant David J. Sokira is a named Plan fiduciary and Secretary of the Plan's Administrative Committee. The Administrative Committee is charged with operating and administering the Plan. Mr. Sokira is also the Okonite Company's Chief Financial Officer and Treasurer. He functions as a Plan fiduciary within the meaning of ERISA section 3(21), 29 U.S.C. § 1002(21) in that he exercises authority over the Plans' assets and exercises discretionary authority over the Plans' administration by granting or (in Mr. Fike's case) refusing to pay claims for Plan benefits when due.

**C. DOE DEFENDANTS**

18. Without limitation, unknown "Doe" Defendants 1-10 include other individuals, including other members of the Administrative Committee, as well as Company officers, directors and employees who are or who functioned as fiduciaries of the Plan within the meaning of ERISA section 3(21)(A), 29 U.S.C. § 1002(21)(A). The identities of the Doe Defendants are currently unknown to Plaintiff. Once their identities are ascertained, Plaintiff will seek leave to join them in the instant action under their true names.

## STATEMENT OF FACTS

19. The Okonite Company is a leader in the insulated electric wire and cable industry. It

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

specializes in control, distribution, instrumentation, power, signal, communication transmission, and special purpose wire and cable products for high and low voltage needs. The Okonite Company supplies its products to electric utilities, rapid transit systems, railroads, chemical producers, refineries, pulp and paper mills and other industries both domestically and internationally.

20. The Okonite Company was founded in 1878 as one of the original insulators of electrical wire and cable. From 1878 to June of 1976, the Okonite Company was a privately held, limited investor owned company.

21. In January 1, 1976, the Okonite Company became an employee owned company through the implementation of an Employees' Stock Ownership Trust.

22. On information and belief Plaintiff alleges that in 1976 the Okonite Company adopted The Okonite Company, Inc. Employees' Stock Ownership Plan. The Okonite Company, Inc. Employees' Stock Ownership Plan is a pension plan that permits employees to acquire ownership in the Okonite Company.

23. The Plan's benefits are funded through contributions by the Okonite Company. The amount of these contributions are to be determined each plan year by the Okonite Company. Exh. A at p. 27, § 4.2.

24. Defendants promised that the participants' interest in the amounts contributed into the Plan was to become "100 percent vested" when the participant has "completed five years of Vesting Service." Exh. A at p. 42, § 7.1.

25. The Plan states that "Any distribution of benefits pursuant to this Plan shall be made in a single lump sum payment of cash only." Exh. A at p. 45, § 8.1.

26. Section 8.3 of the Plan, as amended effective January 1, 2005, states in pertinent part as follows:

> **With respect to any Company Stock, if any, which was acquired by the Trust through Company Stock Obligations after December 31, 1986, ("post-1986 Stock") and which is credited to a Participant's Account, the Participant shall be entitled to receive a distribution as of the last day of the fifth Plan Year following his termination. . . . The Administrative Committee may in its sole discretion accelerate the time of distribution of such benefits because of the Participant's state of health or similar personal**

**emergency or other administrative reasons; . . . .**[1]

Exh. A, Plan § 8.3 at pp. 46-47; Exh. C.

27. Plaintiff completed 8 years of Vesting Service. Plaintiff's interest in the amount contributed into the Plan was 100% vested upon his termination of employment in 1989.

28. During May 2000, Mr. Fike was diagnosed with an HIV/AIDS infection. An HIV/AIDS infection is a life-threatening medical condition. Over the past few years his HIV/AIDS infection has exhausted Mr. Fike's economic resources. Mr. Fike's taxable income for 2009 was $2,079. He had no taxable income for 2010. Mr. Fike's medical condition has made him unable to work.

29. As of July 1, 2010, the Plaintiff had acquired 3,882.8954 shares of the Okonite Company through his participation in the Plan. The value of Plaintiff's interest in the Plan was $95,519.23. A true and correct copy of Mr. Fike's July 1, 2010 ESOP Account statement is attached hereto as Exhibit D.

30. Mr. Fike has been in desperate economic circumstances for over two years. On August 26, 2010 Mr. Fike wrote Mr. Sokira at the Plan asking questions about distributions. One of the questions asked about early pay-outs in the event of death. A true and correct copy of Mr. Fike's August 26, 2010 email and Mr. Sokira's response is attached hereto as Exhibit E.

31. Mr. Fike's AIDS related medical condition has continued to deteriorate during 2011. He is currently receiving AIDS related psychiatric care at Kaiser Permanente in San Francisco.

32. Mr. Fike came to understand that the Plan permitted executives and employees to submit fake death certificates in order to receive Plan Distributions. Mr. Fike, acting on his own behalf, submitted a falsified death certificate in November 2010. Mr. Fike contends that the idea to send in a fake death certificate was suggested during a telephone call and email with Mr. Sokira[2], the Secretary of the Plan's Administrative Committee. Mr. Sokira told Mr. Fike that if he sent his death certificate into the Plan in early December 2010, the Plan would distribute his ESOP money in late December 2010. A true and correct copy of a December 2010 letter from Mr. Fike to Mr. Sokira shows it was Mr. Fike's understanding that if he sent Mr. Sokira a death certificate in November, he

[1] Emphasis added.
[2] *See* Exhibit G.



Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

would receive his plan money in December. A true and correct copy of the December 2010 letter is attached as Exhibit F.

33. On December 17, 2010 Mr. Fike's attorney learned of Mr. Fike's death. A true and correct copy of Mr. Baker's December 17, 2010 letter is attached as Exhibit G.

34. On December 28, 2010 Mr. Fike wrote Mr. Baker informing him that, "I have not died. Based on a suggestion by Mr. Sokira of the Okonite Company in a phone call and email, that I send in my death certificate this early December 2010 and Okonite would send me my ESOP money in late December, I did just that. This practice – "of sending in a death certificate in December" – was done each year by the Regional Vice Presidents at The Okonite Company to receive Christmas bonuses from these accounts." A true and correct copy of the December 28, 2010 letter from Mr. Fike to Mr. Baker is attached hereto as Exhibit H.

35. On April 18, 2011, Mr. Fike requested a Plan distribution pursuant to Section 8.3 of the Plan. This letter explained in pertinent part:

> Mr. Fike would like to take a distribution of his Plan benefits. Plan Section 8.3 states:
>
> With respect to any Company stock, if any, which was acquired by the Trustee through Company Stock obligations after December 31, 1986, ("post-1986 Stock") and which is credited to a Participant's Account, the Participant shall be entitled to receive a distribution as of the last day of the fifth Plan Year following his termination.
>
> Please send me the appropriate distribution election forms that Mr. Fike needs to complete at your earliest convenience. Mr. Fike would also like for you to provide him with an estimate of the amount of the "post-1986 Stock" in his Account.
>
> Mr. Fike is seriously ill with HIV. His illness has devastated his finances. It also makes it very difficult for him to stay employed. Could you please also provide me with the standards the Plan uses for making distributions because of a "Participant's state of health or similar personal emergency?" *See* Amendment for Mandatory Distribution Requirement dated January 1, 2005."

A true and correct copy of the Plaintiff's request is attached to this Complaint as Exhibit I.

36. On April 20, 2011, Defendants summarily rejected Plaintiff's distribution request stating:

> The Trustee did not acquire any Company Stock through Company

Stock obligations after December 31, 1986, so that there is no "post-1986 Stock" in the Plan. As you can see from the Plan Document, it was adopted in 1976, and there were no later Company Stock obligations incurred. Therefore, Mr. Fike has no "post-1986 Stock" in his Account that can be distributed.

Furthermore, the Administrative Committee has determined in its sole discretion, as allowable under the Mandatory Distribution Amendment, not to make early distribution on account of any Participant's state of health. The Committee does not want to undertake the administrative burden of ascertaining the health status of terminated Participants or their financial ability to pay for their own healthcare or obtain government health benefits. Mr. Fike himself illustrates the difficulty that would be incurred in assessing the validity of documents sent to back up health claims, since he previously sent a fake death certificate.

A true and correct copy of the Defendant's response is attached to this Complaint as Exhibit J.

37. On May 4, 2011, Plaintiff sent a five page letter via Federal Express asking Defendants for additional information about how Section 8.3 of the Plan worked so he could draft a proper appeal. Twenty-nine separate questions were asked about how Plan Section 8.3 worked. Among the 29 questions posed to the Administrative Committee were the following:

Please provide a written response to the following questions:

1. Please identify the Plan provision giving the Committee the power to override the Plan's express terms based on administrative burden.

2. Has the Committee ever previously exercised its discretion to suspend Plan distributions under Plan section 8.3? If yes, please identify the date and the reason for taking said action.

3. Has the Committee ever previously exercised its discretion to override an express Plan term based on its "administrative burden?"

4. If it has, please identify the Plan provision, the date and the reason for taking the action.

5. Why was the amendment to Plan section initially 8.3 adopted? Was the first participant to receive a distribution under amended Plan section 8.3 a highly compensated employee, a 5 percent owner, a highly paid employee or in the top paid group?

6. Please identify the types of evidence the Committee has relied on in granting Plan distribution requests under section 8.3.

7. Please also identify the types of evidence the Committee has relied on in denying distribution requests under section 8.3.



Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

> 8. Please explain why the Committee now believes Plan participants' distribution requests under section 8.3 are too burdensome for the Committee's consideration.
>
> 9. Please explain why denying all Participant distribution requests for poor health or similar personal emergency is in the best interests of the Plan's participants and beneficiaries.
>
> 10. How does the Committee's decision to issue a blanket denial for all distributions requests under Plan section 8.3 square with the Committee's fiduciary duty to act "solely in the interests of the Participants and beneficiaries for the exclusive purpose of: (i) providing benefits to participants . . . . (D) in accordance with the documents and instruments governing the plan?" *See* 29 U.S.C. § 1104(a).

A true and correct copy of the Plaintiff's May 4, 2011 request for additional information is attached to this Complaint as Exhibit K.

38. On or around May 27, 2011 Defendants refused to respond to any of Plaintiff's requests for information. Defendants stated:

> With respect to Section 8.3, this is not in any way a requirement that a benefit be paid out before death or Normal Retirement Date. It is a restriction against making such a payment, at the discretion of the Administrative Committee, without the Participant's consent. No payment has ever been made to a Participant, with or without consent, pursuant to Section 8.3. Under these circumstances, your questions with respect to Section 8.3 are not relevant.

A true and correct copy of the Defendant's response is attached to this Complaint as Exhibit L.

39. The Administrative Committee's refusal to even consider requests for distributions under Plan Section 8.3 based on the fact that "the Administrative Committee has determined in its sole discretion, as allowable under the Mandatory Distribution Amendment, not to make early distribution on account of any Participant's state of health" shows any further request for a review of Mr. Fike's distribution request would be futile. *See* Exh. I. The April 20, 2011 denial by the Administrative Committee of Mr. Fike's claim was demonstrably deficient. The Administrative Committee failed to provide any explanation of the "claims review procedure" or Mr. Fike's legal right to obtain additional information as required by Plan Section 9.2 and ERISA. Nor was Mr. Fike advised of his right to file a lawsuit if he was dissatisfied with the actions of the Administrative Committee.

40. The Administrative Committee did not provide Mr. Fike with a "full and fair" review



Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

of his denied claim as is required by ERISA section 503(2); 29 U.S.C. § 1133(2). The summary refusal by the Administrative Committee to even consider Mr. Fike's "state of health" or "personal emergency" as well as the Administrative Committee's refusal to respond to any of Plaintiff's April 18, 2011 or May 27, 2011 information requests demonstrates that any additional attempts to use the claim review process would be meaningless and futile.

**COUNT I**

**Claim for Plan Benefits Due and Owing as To The Plan Defendants**

41. Plaintiff incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

42. The Plan promised that "With respect to any Company Stock, if any, which was acquired by the Trust through Company Stock Obligations after December 31, 1986, ("post-1986 stock") and which is credited to a Participant's Account, the Participant shall be entitled to receive a distribution as of the last day of the fifth Plan Year following his termination." Exh. A, at p. 46, Plan § 8.3. The Plan also promised that "balances shall be distributed as soon as practicable (but in no event later than 60 days) . . ." Exh. A, at pp. 46-47, Plan § 8.3. The Administrative Committee has refused to provide any evidence showing the Plan has no "Company Stock Obligations" acquired after December 31, 1986.

43. Upon information and belief Plaintiff's Account was credited with Company Stock acquired by the Trust though Company Stock Obligations after December 31, 1986. Upon termination of his employment, Plaintiff's Plan benefits became 100% vested.

44. The Plan promised Plaintiff that he would receive a lump sum benefit distribution no later than 60 days after the termination of his employment. Plaintiff has not received his full Plan benefits.

45. Plan Section 8.3 also promised that the Administrative Committee may, at its sole discretion, "accelerate the time of distribution of such benefits because of the Participant's state of health or similar personal emergency or other administrative reasons. . . ." Exh. A, at p. 47, Plan§ 8.3; Exh. C.

46. Mr. Fike suffers from a life-threatening and debilitating medical condition due to his

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

HIV/AIDS infection. Plaintiff's medical condition has completely exhausted his economic resources and has made it impossible for him to gain employment.

47. Plan Section 8.3 promises that the Administrative Committee will consider Mr. Fike's state of health or similar personal emergency in deciding whether to accelerate the time of distribution of his Plan benefits.

48. The Administrative Committee has stonewalled each of Mr. Fike's requests. The Administrative Committee's refusal to consider any Plan distribution request under Plan Section 8.3 is, at best, an unlawful "after the fact" Plan amendment. The Administrative Committee's actions contravene the express terms of the Plan. The decision not to consider Mr. Fike's state of health or financial condition was discriminatory and an abuse of discretion.

49. The Administrative Committee has failed to administer the Plan in accordance with its terms and has failed to provide Plaintiff with a satisfactory explanation about why Plan benefit distributions under Plan Section 8.3 will not even be considered. The Administrative Committee's claim that it would be "administratively burdensome" to consider Mr. Fike's distribution request contravenes both the purpose of Plan Section 8.3 and contravenes the underlying purpose of the Plan.

50. ERISA section 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), entitles a participant or beneficiary to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.

51. As a direct and proximate result of the Defendants' actions, Mr. Fike's Plan benefits have been wrongfully denied. The Defendants' actions have also created a case or actual controversy by and between the parties hereto entitling the Plaintiff to a declaration of rights clarifying the benefits to which he is entitled under the Plan. Plaintiff seeks an order from this Court ordering the Plan Defendants to immediately reinstate Plan Section 8.3 and to pay Mr. Fike his Plan benefits immediately.

**COUNT II**

**Breach of Fiduciary Duty**

52. Plaintiff incorporates by reference the allegations contained in the previous

paragraphs of this Complaint as if fully set forth herein.

53. ERISA section 404(a)(1), 29 U.S.C. 1104(a)(1) imposes on a Plan fiduciary duties to discharge his duties with respect to a plan in accordance with the Plan's terms, solely in the interests of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries.

54. The Defendants breached their fiduciary duties described above by refusing to consider any claims arising under Section 8.3 of the Plan. Furthermore, the Defendants deliberately administered the claims review process in a way that discriminated against Mr. Fike in that their actions unduly inhibited and hampered the initiating or processing of Mr. Fike's claim for benefits.

55. By failing to give full and fair review of Plaintiff's claim, the Defendants breached their fiduciary duties of loyalty, care and prudence.

56. The Defendants also breached their duty of loyalty by failing to provide the Plaintiff with any information regarding Section 8.3 of the Plan, or any evidence showing the Plan had not acquired any "Company Stock obligations" after 1986. By failing to provide Mr. Fike with the information he requested and by failing to provide him with a satisfactory explanation about why his Plan benefits could not be distributed, Defendants breached their fiduciary duties of loyalty, care and obedience to the terms of the Plan.

57. Defendants are liable as co-fiduciaries under ERISA section 405, 29 U.S.C. §1105. Each Defendant is liable for each others' fiduciary breach if he knowingly participates in or undertakes to conceal an act or omission of the other fiduciary or if by his own breach of fiduciary duty, enables the other fiduciary to commit a breach, or if he fails to make reasonable efforts to remedy what he knows to be the other fiduciary's breach.

58. By their acts and omissions as set forth above, and pursuant to ERISA section 405, 29 U.S.C. §1105, the Defendants are jointly and severally liable for the breaches of fiduciary duty committed by each and all of them.

59. Pursuant to ERISA section 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA section 409, 29 U.S.C. § 1109, Defendants are personally liable to restore the losses to the Plan caused by their breaches of fiduciary duties.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

**COUNT III**

**Prohibited Transaction**

60. Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

61. At all times relevant to this action, ERISA section 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D) prohibited the Defendants from causing the Plan to engage in a transaction which they knew or should have known constituted a direct or indirect use of the Plan's assets by or for the benefit of a party in interest except as provided in ERISA section 408, 29 U.S.C. § 1108.

62. By wrongfully refusing to consider Mr. Fike's request for a Plan distribution due to his declining health and precarious financial situation both caused by his AIDS infection, Defendants have dealt with the assets of the Plan in their own self-interest in violation of ERISA section 406(b)(1), 29 U.S.C. § 1106(b)(1). By their actions as set forth above, the Defendants negligently caused the Plan to engage in non-exempt, prohibited transactions in violation of ERISA section 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D).

63. As a result of the violations of ERISA section 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D) and ERISA section 406(b)(1), 29 U.S.C. § 1106(b)(1) as alleged above, the Plan's assets were directly or indirectly used by or for the benefit of the Defendants, which, as parties in interest with respect to the Plan, unjustly benefitted them at the expense of Mr. Fike and the other Plan participants.

64. Pursuant to ERISA section 406, 29 U.S.C. § 1106 the Defendants are personally liable to restore the losses to the Plan's participants caused by their self-dealing conduct.

**COUNT IV**

**Interference-ERISA section 510, 29 U.S.C. § 1140**

65. Plaintiff incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

66. Section 510 of the ERISA statute, 29 U.S.C. § 1140, Interference with Protected Rights, states in relevant part:

> It shall be unlawful for any person to discharge, fine, suspend, expel,

> discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, this subchapter, section 1201 of this title, or the Welfare and Pension Plans Disclosure Act [29 U.S.C. 301 et seq.], or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan . . .

67. Plaintiff is protected by ERISA section 510, 29 U. S.C. § 1140 by reason of his Plan participation.

68. Defendants intentionally interfered with the rights of Mr. Fike by failing to administer the Plan in accordance with its terms. On information and belief Plaintiff alleges Defendants' refusal to consider his request for a Plan distribution is based on sexual orientation discrimination or because he suffers from HIV/AIDS.

69. The foregoing conduct constitutes unlawful interference with Plaintiffs' rights under the Plan in violation of ERISA section 510, 29 U. S.C. § 1140 by the Defendants, and through the actions of their agents and employees.

70. As a direct and proximate result of Defendants' unlawful and discriminatory acts, Mr. Fike's HIV/AIDS condition has worsened because he cannot afford to pay for needed medications. Mr. Fike has also suffered a loss of income, including past-due and future benefits under the Plan.

71. By unlawfully interfering with Plaintiff's vested benefits under the Plan. The Defendants and their successors are jointly and severally liable for his lost income, additional medical expenses and any and all past-due and/or future Plan benefits to Plaintiffs.

**COUNT V**

**Violation of ERISA section 502(c)(1), Failure to Provide Requested Plan Information and Claim for Penalties**

72. Plaintiff incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

73. ERISA section 502(c), 29 U.S.C. § 1132(c) provides for penalties for Defendants' failure to respond to Mr. Fike's request for Plan information:

> (1) Any administrator . . . (B) who fails or refuses to comply with a request for any information which such administrator is required by

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

> this subchapter to furnish to a participant or beneficiary . . . within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 per day from the date of such failure or refusal, and the court may in its discretion order such relief as it deems proper.[3]

74. The imposition of penalties for failing to timely supply information requested by Mr. Fike is at the discretion of the Court. *Id.* Mr. Fike's requests for needed Plan information, dated April 18, 2011 and May 4, 2011 went unanswered. Mr. Fike can demonstrate the following factors in support of his claim: (1) The Defendants' conduct in their summary refusals to consider his requests for information are evidence of bad faith; (2) given Mr. Fike's poor physical condition and dire economic straits, the delay caused by Defendants' deliberate refusal to provide necessary information was unreasonable; (3) Mr. Fike made two separate information requests and none of his questions were answered; (4) Mr. Fike explained that without answers to his questions about Section 8.3, it became impossible to submit a proper appeal; and (5) Mr. Fike has experienced prejudice in that he is unable to pay for food, lodging and needed medications because of Defendants' refusal to properly administer the Plan.

75. Mr. Fike requests a monetary penalty of $110 per day, as well as any appropriate equitable relief the Court deems just as to Count V.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for the following relief:

A. That the Court declare Defendants have breached their fiduciary duties to Plaintiff;

B. That the Court declare that Defendants, along with Defendants' directors and officers, are jointly and severally liable for the breaches of fiduciary duty and/or for interfering with Plaintiff's vested rights under the Plans;

C. That the Court order Defendants to immediately pay Plaintiff all of his Plan benefits;

D. That the Court enjoin Defendants from any further interference with Plaintiff's rights to Plan benefits;

E. That the Court order Defendants to pay Plaintiff prejudgment interest on all benefits that have accrued prior to the date of judgment;

[3] As required by the Debt Collection Improvement Act of 1996, the $100 limit has been increased to $110 per day for violations after July 29, 1997.



Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

F. That the Court award Plaintiffs their attorneys' fees and costs pursuant to ERISA section 502(g), 29 U.S.C. § 1132(g); and

G. For such other and appropriate equitable relief, including back pay and the additional costs for his medical care, as this Court may deem just and proper.

Dated: July 1, 2011

WINSTON & STRAWN LLP

By: [signature]
James P. Baker
Attorneys for Plaintiff



# EXHIBIT A

# THE OKONITE COMPANY, INC.

# EMPLOYEES' STOCK OWNERSHIP PLAN

## AS AMENDED EFFECTIVE JANUARY 1, 1997

GREENBERG DAUBER EPSTEIN & TUCKER
A Professional Corporation
One Gateway Center, Suite 600
Newark, New Jersey 07102
(973) 643-3700

THE OKONITE COMPANY, INC.
EMPLOYEES' STOCK OWNERSHIP PLAN
AS AMENDED EFFECTIVE JANUARY 1, 1997

WHEREAS, The Okonite Company, Inc. (the "Company") adopted THE OKONITE COMPANY, INC. EMPLOYEES' STOCK OWNERSHIP PLAN (The "Plan") effective January 1, 1976; and

WHEREAS, the Company amended the Plan from time to time and last restated the entire Plan effective January 1, 1989; and

WHEREAS, in Section 11.3, the Company reserved the right to amend the Plan; and

WHEREAS, The Company amended the Plan on January 31, 2002 by restating it in its entirety in order to comply with current legal requirements; and

WHEREAS, the Internal Revenue Service has issued a favorable determination letter dated July 29, 2002 with respect to the Plan, subject to the adoption of certain proposed amendments; and

WHEREAS, the Company has authorized its officers to take such action as is necessary to obtain a favorable determination letter; and

WHEREAS, the officers have had the Plan restated again in its entirety to include such proposed amendments in Sections 2.21(g), 2.37, 6.1, and 6.2 of the following Plan document;

NOW THEREFORE, the Plan is restated in its entirety as follows, effective as of January 1, 1997 or such other dates as are specifically provided herein.

IN WITNESS WHEREOF, the Company has caused this instrument to be executed by its duly authorized officers on this 15 day of August, 2002.

ATTEST:

ASSISTANT SECRETARY

THE OKONITE COMPANY, INC.

By: ______________________

David J. Sokira, Vice President

TABLE OF CONTENTS

| | | Page |
|---|---|---|
| SECTION 1. | PLAN IDENTITY | 1 |
| 1.1 | Name | 1 |
| 1.2 | Purpose | 1 |
| 1.3 | Effective Date | 1 |
| 1.4 | Fiscal Period | 1 |
| 1.5 | Treatment of Plan for Participating Employers | 1 |
| 1.6 | Interpretation of Provisions | 2 |
| SECTION 2. | DEFINITIONS | 3 |
| SECTION 3. | ELIGIBILITY FOR PARTICIPATION | 26 |
| 3.1 | Initial Eligibility | 26 |
| 3.2 | Periods of Active Participation | 26 |
| SECTION 4. | TRUST FUND AND CONTRIBUTIONS | 27 |
| 4.1 | The Trust Fund | 27 |
| 4.2 | Company Contributions | 27 |
| 4.3 | Conditions as to Contributions | 28 |
| 4.4 | Contributions by Participants | 28 |
| 4.5 | Rollovers and Transfers | 29 |
| 4.6 | Use of Contributions | 29 |
| 4.7 | Use of Earnings | 29 |
| SECTION 5. | ACCOUNTS AND ALLOCATIONS | 30 |
| 5.1 | Company Stock Accounts | 30 |
| 5.2 | Investment Accounts | 30 |
| 5.3 | Suspense Account | 30 |
| 5.4 | Unallocated Company Stock Account | 30 |
| 5.5 | Unallocated Stock Dividend Account | 30 |
| 5.6 | Year End Account Adjustments | 31 |
| 5.7 | Adjustment for Net Changes in Assets | 31 |
| 5.8 | Forfeitures | 31 |
| 5.9 | Transfers from Unallocated Accounts | 32 |
| 5.10 | Allocations to Active Participants' Accounts | 32 |
| 5.11 | Authority for Investment Changes | 34 |
| 5.12 | Prohibited Allocations | 34 |

SECTION 6. LIMITATIONS ON CONTRIBUTIONS FOR PARTICIPANTS . . . 35

6.1 Limitation on Annual Additions . . . . . . . . . 35
6.2 Coordinated Limitation With Other Plans . . . 36
6.3 Effect of Limitations . . . . . . . . . . . . . 40

SECTION 7. VESTING AND FORFEITURES . . . . . . . . . . . . . 42

7.1 Vesting and Participants' Accounts . . . . . . . 42
7.2 Full Vesting Upon Certain Events . . . . . . . . 42
7.3 Breaks In Service . . . . . . . . . . . . . . . 43
7.4 Full Vesting Upon Plan Termination . . . . . . . 43
7.5 Forfeitures . . . . . . . . . . . . . . . . . . 44
7.6 Restoration of Forfeited Interest . . . . . . . 44
7.7 Vesting and Nonforfeitability . . . . . . . . . 44

SECTION 8. DISTRIBUTION OF BENEFITS . . . . . . . . . . . . . 45

8.1 Form of Distribution . . . . . . . . . . . . . . 45
8.2 Retirement, Disability, Death or Attainment of Age 70 ½ . . . . . . . . . . . 45
8.3 Other Termination . . . . . . . . . . . . . . . 46
8.4 Deferral and Timing of Benefit Payments . . . 47
8.5 Delay in Benefit Determination . . . . . . . . 48
8.6 Distribution to Beneficiaries . . . . . . . . . 48
8.7 Early Distribution Election . . . . . . . . . . 49
8.8 Election Formalities . . . . . . . . . . . . . . 50
8.9 Marital Status . . . . . . . . . . . . . . . . . 50
8.10 Accounting for Benefit Distributions . . . . . 51
8.11 Option to Have Company Purchase . . . . . . . . 51
8.12 Right of First Refusal . . . . . . . . . . . . . 53
8.13 Valuation . . . . . . . . . . . . . . . . . . . 54
8.14 Direct Transfers . . . . . . . . . . . . . . . . 54

SECTION 9. RULES GOVERNING BENEFIT CLAIMS AND REVIEW OF APPEAL . . . . . . . 57

9.1 Claim for Benefits . . . . . . . . . . . . . . . 57
9.2 Notification by Committee . . . . . . . . . . . 57
9.3 Claims Review Procedure . . . . . . . . . . . . 58

SECTION 10. THE ADMINISTRATIVE COMMITTEE AND THE INVESTMENT COMMITTEE . . . . . . . . . 60

10.1 Authority of Administrative Committee . . . . 60
10.2 Membership of Administrative Committee . . . . 60
10.3 Duties of Secretary . . . . . . . . . . . . . . 61
10.4 Actions by Administrative Committee . . . . . 61

| | | |
|---|---|---|
| 10.5 | Execution of Documents | 62 |
| 10.6 | Adoption of Rules | 62 |
| 10.7 | Responsibilities to Participants | 62 |
| 10.8 | Establishment of Participant's Accounts | 63 |
| 10.9 | Authority of Investment Committee | 63 |
| 10.10 | Membership of Investment Committee | 64 |
| 10.11 | Investment Policy and Implementation | 64 |
| 10.12 | Actions by Investment Committee | 65 |
| 10.13 | Execution of Documents | 65 |
| 10.14 | Valuation of Company Stock | 65 |
| 10.15 | Compliance with ERISA | 66 |
| 10.16 | Compensation and Indemnification by Company | 66 |
| SECTION 11. | <u>ADOPTION, AMENDMENT OR TERMINATION OF THE PLAN</u> | 67 |
| 11.1 | Adoption of Plan by Other Employers | 67 |
| 11.2 | Adoption of Plan by Successor | 67 |
| 11.3 | Right to Amend or Terminate | 68 |
| 11.4 | Plan Restatement Subject to Qualification | 69 |
| SECTION 12. | <u>MISCELLANEOUS PROVISIONS</u> | 71 |
| 12.1 | Plan Creates No Employment Rights | 71 |
| 12.2 | Nonassignability of Benefits | 71 |
| 12.3 | Limit of Employer Liability | 71 |
| 12.4 | Treatment of Expenses | 72 |
| 12.5 | Number and Gender | 72 |
| 12.6 | Nondiversion of Assets | 72 |
| 12.7 | Incapacity to Receive Benefits | 72 |
| 12.8 | Separability of Provisions | 73 |
| 12.9 | Service of Process | 73 |
| 12.10 | Governing State Law | 73 |

# THE OKONITE COMPANY, INC.

# EMPLOYEES' STOCK OWNERSHIP PLAN

# AMENDED AS OF JANUARY 1, 1997

## SECTION 1. PLAN IDENTITY.

1.1 Name. The name of this Plan is The Okonite Company, Inc. Employees' Stock Ownership Plan.

1.2 Purpose. The purpose of this Plan is to enable the employees of the Company to acquire beneficial ownership in the Company under the terms and conditions described herein so as to improve production, stimulate sales, and provide an incentive for employees to continue in the employ of the Company.

1.3 Effective Date. The original Effective Date of this Plan was January 1, 1976, but the provisions of the Plan as revised effective January 1, 1997, shall apply only to individuals who are employed by an Employer on or after that date, except as otherwise specifically provided herein.

1.4 Fiscal Period. This Plan shall be operated on the basis of a fiscal year beginning January 1 of each year for the purposes of keeping the Plan's books and records, and distributing or filing any reports or returns required by law.

1.5 Treatment of Plan for Participating Employers. This Plan shall be treated as a single Plan with respect to all participating Employers for the purpose of allocations as provided

in Section 5.10, distributing benefits, determining whether there has been any termination of Service, and applying the limitations set forth in Section 6.

1.6 Interpretation of Provisions. The Company intends this Plan and the Trust to be a qualified employees' stock ownership plan under sections 401(a) and 4975(e)(7) of the Code and to satisfy any applicable requirement under ERISA. Accordingly, the Plan and Trust Agreement shall be interpreted and applied in a manner consistent with this intent and shall be administered at all times and in all respects in a nondiscriminatory manner.

SECTION 2. <u>DEFINITIONS</u>. The following words and phrases shall have the meaning specified when used in this Plan and in the Trust Agreement, unless the context clearly indicates otherwise.

2.1 "Active Participant" shall mean any employee who has satisfied the eligibility requirements and is qualified as an Active Participant for a Plan Year pursuant to Section 3.

2.2 "Administrative Committee" shall mean the committee described in Section 10 which manages and administers this Plan.

2.3 "Allocation Points" shall mean points relating to the compensation and service of Active Participants which are used to allocate contributions and forfeitures to the Participants' Company Stock Accounts and Investment Accounts pursuant to Section 5.10. A Participant's Allocation Points shall be computed as of the last day of the Plan Year in accordance with the following formula:

(a) one (1) point for each Base Compensation Unit; and

(b) three (3) points for each year of Vesting Service.

2.4 "Base Compensation" shall mean an amount equal to a Participant's wages and salary received or imputed for personal services rendered while in Service with an Employer as reported on Form W-2 for federal income tax purposes, but shall exclude any

payments under an ERISA section (3)36 plan, any deferred pay and any severance pay; provided, however, that any amounts deferred by a Participant under a Company sponsored Code section 401(k) plan shall be included in any event. For this purpose, severance pay means all monies paid with respect to a period after a Participant's termination of active Service. Furthermore, a Participant's Base Compensation shall exclude any compensation in any limitation year or Plan Year in excess of the limit currently in effect under section 401(a)(17) of the Code (i.e., $170,000 in 2000).. The cost of living adjustment in effect for a calendar year applies to any period, not exceeding twelve (12) months, over which Compensation is determined, (determination period) beginning in such calendar year. Provided however, that such limit shall be proportionately reduced in the case of a limitation year or Plan Year containing less than 12 months. If, during the limitation year or Plan year, any of the Participant, the Participant's spouse, or a lineal descendant of the Participant who has not reached age 19 by the end of the year, is either (i) a Five-Percent Owner or (ii) a Highly Paid Employee who is among the Employer's 10 most highly compensated Employees, then the foregoing limitation shall be allocated among such individuals in proportion to each such individual's Compensation as determined under this section prior to the application of this limitation, in accordance with section 414(q)(6) of the Code and applicable Treasury Regulations.

2.5 "Base Compensation Units" shall mean the number of whole units produced by dividing an Active Participant's Base Compensation by $100.

2.6 "Beneficiary" shall mean the person or persons who are designated by a Participant to receive benefits payable under the Plan on the Participant's death, In the absence of any designation, or if all the designated Beneficiaries shall die before the Participant dies or shall die before all benefits have been paid, the Participant's Beneficiary shall be his surviving Spouse, if any, or his issue, per stirpes, if he is not survived by a Spouse. In that event, the Administrative Committee may rely upon the advice of the Participant's executor or administrator as to the identity and relationship of the Participant's Spouse and issue. If there shall not be any Spouse or issue then living, or if the Administrative Committee is unable to obtain the necessary information, the Participant's Beneficiary shall be his estate.

2.7 "Board" shall mean the Directors of the Company.

2.8 "Break in Service" shall mean any five or more consecutive 12-month periods beginning January 1, in which an Employee has 500 or fewer Hours of Service per period. Solely for this purpose, an Employee shall be considered employed for his normal hours of paid employment during a Recognized Absence or on a leave under the Family and Medical Leave Act, 29, U.S.C. 2601 et seq., unless he does not resume his Service at the end of

Recognized Absence. Further, any Employee who has a Parental Absence, shall be credited with the Hours of Service which would normally have been credited but for such absence, up to a maximum of 501 Hours of Service, in the first 12-month period which would otherwise be counted toward a Break in Service, unless he does not resume his Service at the end of the Parental Absence.

2.9 "Code" shall mean the Internal Revenue Code of 1986, as amended.

2.10 "Company" shall mean The Okonite Company, Inc. and any other corporation, business association, or partnership which shall have adopted this Plan with the approval of the Board of Directors of The Okonite Company, Inc., and any entity which succeeds to the business of The Okonite Company, Inc. and adopts this Plan as its own.

2.11 "Company Stock" shall mean shares of any class of stock which are issued by an Employer and which constitute "qualifying employer securities" under section 409A(1) of the Code and under regulations issued by the Secretary of Labor and the Secretary of the Treasury pursuant to section 407(d)(5) of ERISA.

2.12 "Company Stock Account" shall mean the account of a Participant to which shares of Company Stock are allocated pursuant to Section 5.10.

2.13 "Company Stock Obligations" shall mean obligations arising from any extension of credit to the Trust for the purposes of purchasing Company Stock.

2.14 "Disability" shall mean only such disability which renders a Participant totally unable, as a result of bodily injury or disease, to engage in or perform any duties for an Employer for which he reasonably fitted, which disability is expected to be permanent or of long and indefinite duration; provided, however, that this term shall not include any disability directly or indirectly resulting from or related to habitual drunkenness or addiction to narcotics, a criminal act or attempt, service in the armed forces of any country, an act of war, declared or undeclared, or any injury which was intentionally self-inflicted; and provided, further, that this term shall apply only if (i) the Participant is sufficiently disabled to qualify for the payment of disability benefits under the federal Social Security Act, or (ii) the Participant's disability is certified by two physicians acceptable to the Administrative Committee.

2.15 "Early Retirement Date" shall mean the date on which a Participant has completed at least 5 Vesting Years and is at least 60 years old (whether he reached that age before or after his employment was terminated).

2.16 "Effective Date" shall mean January 1, 1976.

2.17 "Employee" shall mean any individual who is or has been employed by an Employer, or who is or has been a partner or proprietor of an Employer, or who is a "leased employee", excluding for initial eligibility purposes any employment during a period in which the individual was a non-resident alien and did not receive from an Employer any earned income which constituted income from sources within the United States. "Leased employee" means an individual employed by a leasing organization, who pursuant to an agreement between an Employer and the leasing organization, has performed services for the Employer and any related persons (within the meaning of section 414(n)(6) of the Code) on a substantially full-time basis for more than one year, and such services are performed under primary direction or control by the Employer. However, such a "leased employee" shall not be considered an Employee if he participates in a money purchase pension plan sponsored by the leasing organization which provides for immediate participation, immediate full vesting, and an annual contribution of at least 10 percent of the employee's Total Compensation, and (ii) leased employees do not constitute more than 20 percent of the Employer's total workforce (including leased employees, but excluding Highly Paid Employees and any other employees who have not performed services for the Employer on a substantially full-time basis for at least one year). Solely for this purpose, an Employee's Total Compensation shall include any salary reduction

amounts excluded from the Employee's gross taxable income pursuant to any of sections 125, 402(e)(3), 402(h)(1)(B), and 403(b) of the Code.

2.18 "Employer" shall mean the Company, any other corporation, partnership, or proprietorship which adopts this Plan with the Company's consent pursuant to Section 11.1, and any entity which succeeds to the business of any Employer and adopts the Plan pursuant to Section 11.2.

2.19 "ERISA" shall mean the Employee Retirement Income Security Act of 1974 (P.L. 93-406, as amended).

2.20 "Five-Percent Owner" shall mean an Employee who owns more than five percent of the outstanding equity interest or the outstanding voting interest in an Employer.

2.21 "Highly Paid Employee" for any Plan Year shall mean an Employee who, during the immediately preceding Plan Year, (i) was at any time a Five-Percent Owner, (ii) had Total Compensation exceeding $80,000, or (iii) was in the"Top Paid Group". For this purpose:

(a) "Total Compensation" means compensation within the meaning of section 415(c)(3) of the Code and shall include any amount which is excludable from the Employee's gross income for tax purposes pursuant to section 125, 402(e)(3), 402(h)(1)(B), 403(b) or 457 of the Code.

(b) "Top Paid Group" means a group consisting of the most highly compensated one-fifth of all Employees and shall be determined by taking into account all individuals working for all related employer entities described in the definition of "Service", but excluding any individual who has not completed six months of Service, who normally works fewer than 17-1/2 hours per week or in fewer than six months per year, who has not reached age 21, whose employment is covered by a collective bargaining agreement, or who is a nonresident alien who receives no earned income from United States sources.

(c) The $80,000 limit shall be adjusted for the cost of living after the calendar quarter ending September 30, 1996 in the same manner as prescribed under section 415(d)of the Code.

(d) "Highly Paid Employee includes highly compensated active Employees and highly compensated former Employees. A highly compensated active Employee means an Employee who: (a) was a Five-Percent Owner (as defined in section 416(i)1) of the Code) of the Employer at any time during the current or the preceding year, or (b) for the preceding year had Compensation from the Employer in excess of $80.000 (as adjusted pursuant to section 415(d) of the code, except that the base period shall be the calendar quarter ending September 30, 1996.)

(e) A former Employee shall be counted as a Highly Paid Employee if he was a Highly Paid Employee during either the Plan

Year in which his Service ended or any Plan Year ending after his 55th birthday.

(f) In all respects, the determination of who are Highly Paid Employees shall be made in accordance with section 414(q) of the Code and the Treasury Regulations thereunder.

(g) The Employer has elected to use the calendar year data beginning with or within the look-back year in determining whether an Employee is a Highly Paid Employee for Plan Years beginning after December 31, 1996, with respect to all of its qualified plans.

2.22 "Hours of Service" shall mean hours to be credited to an Employee under the following rules:

(a) Each hour for which an Employee is paid or is entitled to be paid for services to an Employer is an Hour of Service.

(b) Each hour for which an Employee is directly or indirectly paid or is entitled to be paid for a period of vacation, holidays, illness, disability, layoff, jury duty, temporary military duty, or leave of absence is an Hour of Service. However, except as otherwise specifically provided in Sections 2.8 and 2.46, no more than 501 Hours of Service shall be credited for any single continuous period during which the Employee performs no

duties. Further, no Hours of Service shall be credited on account of payments made solely under a plan maintained to comply with workmen's compensation, unemployment compensation, or disability insurance laws, or to reimburse an Employee for medical expenses.

(c) Each hour for which back pay (ignoring any mitigation of damages) is either awarded or agreed to by an Employer is an Hour of Service. However, no more than 501 Hours of Service shall be credited for any single continuous period during which the Employee would not have performed any duties.

(d) Hours of Service shall be credited in any one period only under one of paragraphs (a), (b) and (c); an Employee may not get double credit for the same period.

(e) If an Employer finds it impractical to count the actual Hours of Service for any class or group of Employees, each Employee in that class or group shall be credited with the Hours of Service shown in the following table for each pay period for which he has at least one Hour of Service:

| Pay Period | Hours of Service Credit |
|---|---|
| Daily | 10 |
| Weekly | 45 |
| Bi-weekly | 90 |
| Semi-Monthly | 95 |
| Monthly | 190 |

However, an Employee shall be credited only for his scheduled working hours during a paid absence.

(f) Hours of Service to be credited on account of a payment to an Employee (including back pay) shall be credited in the computation period in which the Service was rendered or to which the back pay relates. If the period overlaps two or more Plan Years, the Hours of Service credit shall be allocated in proportion to the respective portions of the period included in the several Plan Years. However, in the case of periods of 31 days or less, the Administrative Committee may apply a uniform policy of crediting the Hours of Service to either the first Plan Year or the second.

(g) In all respects an Employee's Hours of Service shall be counted as required by section 2530.200b-2 of the Department of Labor's regulations under Title I of ERISA.

2.23 "Investment Account" shall mean the account of a Participant to which amounts other than Company Stock are allocated pursuant to Section 5.10.

2.24 "Investment Committee" shall mean the committee described in Section 10 which directs the Trustee concerning investments of the Trust Fund with respect to Company stock.

2.25 "Key Employee" shall mean an Employee who at any time during the five years ending on the top-heavy determination date for the Plan Year has performed any Service and has been (i) an officer of the Employer having Total Compensation greater than one-half of the limit then in effect under section 415(b)(1)(A) of the Code, (ii) one of the 10 Employees owning (or considered as owning under section 318 of the Code) the largest interests in the Employer (ignoring any Employee who does not own more than 1/2 percent interest), and having Total Compensation greater than the limit then in effect under section 415(c)(1)(A), (iii) a Five-Percent Owner, or (iv) an owner of more than one percent of the outstanding equity interest or the outstanding voting interest in an Employer whose Total Compensation exceeds $150,000. For this purpose, an Employees' "Total Compensation" shall include any amount which is excludable from the Employee's gross income for tax purposes pursuant to section 125, 402(e)(3), 402(h)(1)(B) or 403(b) of the Code. In determining which individuals are Key Employees, the rules of section 416(i) of the Code and Treasury Regulations

promulgated thereunder shall apply. The Beneficiary of a Key Employee shall also be considered a Key Employee.

2.26 "Nonkey Employee" shall mean an Employee who at any time during the five years ending on the top-heavy determination date for the Plan Year has performed any Service and who is not and has never been a Key Employee, and the Beneficiary of any such Employee.

2.27 "Normal Retirement Date" shall mean a Participant's attainment of age 65.

2.28 "Parental Absence" shall mean an Employee's absence (i) by reason of the Employee's pregnancy, (ii) by reason of the birth of the Employee's child, (iii) by reason of the placement of a child with the Employee in connection with the Employee's adoption of the child, or (iv) for purposes of caring for such child for a period beginning immediately after such birth or placement.

2.29 "Participant" shall mean any Employee who is or previously has been an Active Participant in the Plan and who still has an account balance with the Trust.

2.30 "Plan Year" shall mean each period of 12 consecutive calendar months after the Effective Date commencing January 1st of each year.

2.31 "Prior Plan" shall mean The Okonite Company, Inc. Employees' Stock Ownership Plan as in effect immediately prior to January 1, 1997.

2.32 "Recognized Absence" shall mean a period for which:

(a) an Employer grants the Employee a leave of absence for a limited period, but only if the Employer grants such leaves on a nondiscriminatory basis; or

(b) the Employee is temporarily laid off by an Employer, but only for the 15 months next following the date of such layoff; or

(c) the Employee is on active military duty, but only to the extent his employment rights are protected by USERRA.

2.33 "Service" shall mean an Employee's period(s) of employment or self-employment with an Employer. An Employee's Service shall include any service which constitutes service with a predecessor employer within the meaning of section 414(a) of the Code, including service with any Employer which previously maintained this Plan. Any Employee's Service shall also include any service with an entity which is not an Employer, but only for either (i) a period after 1975 in which the other entity is a member of a controlled group of corporations or is under common control with other trades and businesses within the meaning of

section 414(b) or 414(c) of the Code, and a member of the controlled group or one of the trades and businesses is an Employer, (ii) for a period after 1979 in which the other entity is a member of an affiliated service group within the meaning of section 414(m) of the Code, and a member of the affiliated service group is an Employer, or (iii) for a period after 1983 in which the other entity is a member of a group of businesses, or is part of any arrangement, such that the entity is to be treated as an Employer under Treasury Regulations promulgated pursuant to section 414(o) of the Code.

2.34 "Spouse" shall mean the individual, if any, to whom a Participant is lawfully married on the date benefit payments to the Participant are to begin, or on the date of the Participant's death, if earlier. However, a Participant's former spouse shall be treated as his Spouse in lieu of his current spouse to the extent required under any judgment, decree, or order which is determined by the Administrative Committee in accordance with its policies and procedures to be a qualified domestic relations order within the meaning of section 414(p) of the Code.

2.35 "Suspense Account" shall mean the account described in Section 5.3 in which contributions are segregated until the end of each Plan Year.

2.36 "Top-Heavy Year" shall mean a Plan Year in which the Plan is top-heavy within the meaning of section 416 of the Code.

In this connection, the Administrative Committee shall determine on a regular basis whether each Plan Year is or is not a Top-Heavy Year for purposes of implementing the various provisions of the Plan which apply only to the extent that the plan is top-heavy or super top-heavy within the meaning of section 416 and the Treasury Regulations thereunder. In making this determination, the Administrative Committee shall use the following definitions and principles:

(a) The "Employer" includes all business entities which are considered commonly controlled or affiliated within the meaning of sections 414(b), 414(c), 414(m) and 414(o) of the Code.

(b) The "plan aggregation group" includes each qualified retirement plan or simplified employee pension (as defined in section 408(k) of the Code) which is or has been maintained by the Employer (whether or not terminated) (i) in which a Key Employee is or has been a Participant during any of the five years ending on a determination date, or (ii) which enables or has enabled any plan described in clause (i) to satisfy the requirements of section 401(a)(4) or 410 of the Code during those five years, or (iii) which provides contributions or benefits comparable to those of

the plans described in clauses (i) and (ii) and which is designated by the Administrative Committee as part of the plan aggregation group.

(c) The "determination date", with respect to the first plan year of any plan, means the last day of that plan year, and with respect to each subsequent plan year, means the last day of the preceding plan year. If any other plan has a determination date which differs from this Plan's determination date, the top-heaviness of this Plan shall be determined on the basis of the other plan's determination date which falls within the same calendar year as this Plan's determination date.

(d) The "aggregated benefits" for any Plan Year means (i) the adjusted account balances in defined contribution plans and simplified employee pensions on the determination date, plus (ii) the adjusted value of accrued benefits in defined benefit plans (calculated as of the annual valuation date coinciding with or next preceding the determination date), with respect to Key Employees and Nonkey Employees under all plans within the plan aggregation group which includes

this Plan. For this purpose, the accrued benefit of any Nonkey Employee shall be determined (i) under the accrual method, if any, which is uniformly applicable under all defined benefit plans within the plan aggregation group, or (ii) if there is no such uniform method, as if such benefit accrued under the slowest accrual rate permitted under the fractional rule of section 411(b)(1)(c) of the Code. Further, the "adjusted account balance" and the "adjusted value of accrued benefit" for any Employee shall be increased by all plan distributions made with respect to the Employee during the five years ending on the determination date from any plan within the plan aggregation group and from any terminated plan which during those five years was within the plan aggregation group. In addition, the adjusted account balance under a plan shall not include any amount attributable to a rollover contribution or similar transfer to the plan initiated by an Employee and made after 1983, unless both plans involved are maintained by the Employer, in which event the transferred amount shall be counted in the transferee plan and ignored for all purposes in

the transferor plan. Finally, the adjusted value of accrued benefits under any defined benefit plan shall be determined by assuming whichever actuarial assumptions are prescribed in that plan.

(e) This Plan shall be "top-heavy" for any Plan Year in which the aggregated benefits of the Key Employees exceed 60 percent of the total aggregated benefits for both Key Employees and Nonkey Employees.

(f) This Plan shall be "super top-heavy" for any Plan Year in which the aggregated benefits of the Key Employees exceed 90 percent of the total aggregated benefits for both Key Employees and Nonkey Employees.

2.37 "Total Compensation" shall mean a Participant's wages, salary, overtime, bonuses, commissions, and any other amounts received for personal services rendered while in Service from any Employer or an affiliate (within the purview of sections 414(b), (c), (m) and (o) of the Code), plus his earned income as defined in section 401(c)(2) of the Code if he is self-employed.

A Participant's Total Compensation shall include (i) amounts excludable from gross income under section 911 of the Code, (ii) amounts described in sections 104(a)(3), 105(a), and 105(h) of the Code to the extent includable in gross income, (iii) amounts

received from an Employer for moving expenses which are not deductible under section 217 of the Code, (iv) amounts includable in gross income in the year of, and on account of, the grant of a nonqualified stock option, or under an unfunded plan of deferred compensation, or otherwise includable pursuant to section 83(b) of the Code, and (v) any elective deferrals as defined in Code section 402(g)(3) effective for Plan years beginning after December 31, 1997. Furthermore, for limitation years beginning after December 31, 2001, for purposes of applying the limitations described in Section 6 of this Plan, compensation paid or made available during such limitation years shall include elective amounts that are not includable in the gross income of the employee by reason of Code section 132(f)(4).

Unless otherwise included under the preceding paragraph, a Participant's Total Compensation shall exclude (i) Employer contributions to or amounts received from a funded or qualified plan of deferred compensation, (ii) Employer contributions to a simplified employee pension account to the extent deductible under section 219 of the Code, (iii) Employer contributions to a section 403(b) annuity contract (whether or not excludable from gross income), (iv) amounts includable in gross income pursuant to section 83(a) of the Code, (v) amounts includable in gross income upon the exercise of a nonqualified stock option or upon the disposition of stock acquired under any stock option, and (vi) any

other amounts expended by the Employer on the Participant's behalf which are excludable from his income or which receive special tax benefits. Furthermore, a Participant's Total Compensation shall exclude any compensation in any limitation year or Plan Year in excess of the limit currently in effect under section 401(a)(17) of the Code (i.e., $170,000 in 2000). The cost of living adjustment in effect for a calendar year applies to any period, not exceeding twelve (12) months, over which Compensation is determined, (determination period) beginning in such calendar year. Provided however, that such limit shall be proportionately reduced in the case of a limitation year or Plan Year containing less than 12 months. If, during the limitation year or Plan year, any of the Participant, the Participant's spouse, or a lineal descendant of the Participant who has not reached age 19 by the end of the year, is either (i) a Five-Percent Owner or (ii) a Highly Paid Employee who is among the Employer's 10 most highly compensated Employees, then the foregoing limitation shall be allocated among such individuals in proportion to each such individual's Compensation as determined under this section prior to the application of this limitation, in accordance with section 414(q)(6) of the Code and applicable Treasury Regulations.

2.38 "Trust" or "Trust Fund" shall mean the trust fund created under this Plan, including the fund carried over from the Prior Plan.

2.39 "Trust Agreement" shall mean the agreement between The Okonite Company, Inc. and the Trustee executed in furtherance of this Plan. With respect to the allocation of investment responsibility for the assets of the Trust Fund, the relevant provisions of the Trust Agreement are incorporated herein by reference.

2.40 "Trustee" shall mean such corporate person and/or individual person or persons, or any combination thereof, which or who may be selected from time to time by the Board to serve as trustee or co-trustee of the Trust Fund.

2.41 "Unallocated Accounts" shall mean the Unallocated Company Stock Account and the Unallocated Stock Dividend Account.

2.42 "Unallocated Company Stock Account" shall mean the account described in Section 5.4 in which Company Stock purchased by the Trustee pursuant to an extension of credit is held until allocated.

2.43 "Unallocated Stock Dividend Account" shall mean the account described in Section 5.5 in which stock dividends with respect to unallocated Company Stock are held until allocated.

2.44 "USERRA" shall mean the Uniformed Services Employment and Re-employment Rights Act of 1994. Notwithstanding any provisions of this Plan to the contrary, effective December 12, 1994, contributions, benefits and service credit with respect to

qualified military service will be provided in accordance with Code Section 414(u).

2.45 "Valuation Date" shall mean the last day of each Plan Year (December 31), unless the Investment Committee specifies some other date during the Plan Year. The Investment Committee shall determine the fair market value of the Company Stock and any other assets held under the Plan as of each Valuation Date as soon as practicable after such date. Such valuation shall be effective for the entire period beginning on said Valuation Date until the next Valuation Date.

2.46 "Vesting Service" shall mean employment during a calendar year in which an Employee has at least one thousand (1,000) Hours of Service commencing with the Employee's initial employment by an Employer. Further, if an Employee has less than one thousand (1,000) Hours of Service in each of his initial and final calendar years of employment, and if his total Hours of Service in both such years equals or exceeds one thousand (1,000) Hours of Service, such a combined period of employment shall be considered as one year of Vesting Service. For purposes of calculating Allocation Points under Section 2.3, an Employee shall be credited with Hours of Service for his normally scheduled working hours during any period of Recognized Absence.

SECTION 3. ELIGIBILITY FOR PARTICIPATION.

3.1 Initial Eligibility. Each Employee shall enter the Plan as of the later of the commencement of his employment or the Effective Date.

3.2 Periods of Active Participation. Each eligible Employee shall be an Active Participant in each Plan Year in which his employment by an Employer constitutes Vesting Service. If such an Employee's employment by an Employer does not constitute Vesting Service for a Plan Year, he shall not be an Active Participant in such year, but he shall again become an Active Participant as of the first day of the next succeeding Plan Year in which his employment by an Employer constitutes Vesting Service. Notwithstanding the foregoing, an Employee shall not be considered an Active Participant in a Plan Year in which he earns Vesting Service only because he has fulfilled the combined period of employment described in Section 2.46.

SECTION 4. TRUST FUND AND CONTRIBUTIONS.

4.1 The Trust Fund. The Board shall select the Trustee to whom each Employer shall from time to time contribute such amounts as may be determined by the Employer pursuant to this Plan. Such contributions shall be held in a Trust Fund by the Trustee in accordance with the Trust Agreement between the Trustee and the Company. Under no circumstances shall any portion of such contributions be diverted from the exclusive benefit of the Participants and their Beneficiaries hereunder. The benefits described in this Plan shall be payable only from the assets of the Trust Fund, and none of the Company or Employers, their boards of directors, stockholders, officers, employees, the Administrative Committee, the Investment Committee or the Trustee shall be liable for the payment of any benefit under this Plan except from the Trust Fund.

4.2 Company Contributions. With respect to each Plan Year, each Employer shall:

4.2-1 determine the amount, if any, to be contributed to the Trust for such Plan Year;

4.2-2 determine the date or dates on which such contribution will be made;

4.2-3 designate the Company Stock Obligations, if any, to which the contribution shall be applied; and

4.2-4 determine the form of the contribution pursuant to Section 4.3.

Notwithstanding the foregoing, the total Employers' contribution for each Plan Year shall always include an amount sufficient to enable the Trust to pay all Company Stock Obligations and any other obligations of the Trust as they come due.

4.3 <u>Conditions as to Contributions</u>. An Employer may make contributions in the form of cash, securities, other property, Company Stock, or any combination thereof. Such securities, property and Company Stock shall be valued at their fair market value at the time of contribution. However, such contributions shall in any event consist of cash, or assets readily convertible into cash, to the extent required to satisfy Company Stock Obligations as they come due. Any amount contributed by an Employer due to a good faith mistake of fact shall be returned to the Employer within one year after the date on which the contribution was originally made. However, the amount to be returned shall be reduced to take account of any adverse investment experience within the Trust Fund in order that the balance credited to each Participant's Account is not less than it would have been if the contribution had never been made.

4.4 <u>Contributions by Participants</u>. No Participant shall be required or permitted to make contributions under this Plan.

4.5 Rollovers and Transfers. An Employee who receives a distribution of his interest under a retirement plan maintained by a former employer may not rollover said distribution to this Plan.

4.6 Use of Contributions. After provision has been made to satisfy such portions of the Company Stock Obligations as are designated in accordance with Section 4.2-3, all contributions received by the Trustee shall be used for benefit distributions, to purchase Company Stock, or for such other purposes as are in accordance with the Trust Agreement and the provisions of ERISA with respect to a qualified employees' stock ownership plan.

4.7 Use of Earnings. Investment earnings of the Trust Fund may be used at the discretion and direction of the Investment Committee to satisfy a portion of the Company Stock Obligations or for such other purposes as are in accordance with the Trust Agreement and the provisions of ERISA with respect to a qualified employees' stock ownership plan.

SECTION 5. ACCOUNTS AND ALLOCATIONS.

5.1 Company Stock Accounts. A Company Stock Account shall be maintained for each Participant to which shall be credited the shares of Company Stock allocable to the Participant.

5.2 Investment Accounts. An Investment Account shall be maintained for each Participant to which shall be credited amounts allocable to the Participant other than Company Stock.

5.3 Suspense Account. A Suspense Account shall be maintained by the Trustee as a segregated account in which Employer contributions shall be used by the Trustee in accordance with Section 4.6, and the Trustee shall continue to segregate in the Suspense Account until the last day of each Plan Year any assets received with respect to or in exchange for such contributions.

5.4 Unallocated Company Stock Account. An Unallocated Company Stock Account shall be maintained by the Trustee in which shares of Company Stock purchased by the Trustee pursuant to any extensions of credit, whether or not pledged as collateral, shall be segregated until allocated and credited to the Suspense Account.

5.5 Unallocated Stock Dividend Account. An Unallocated Stock Dividend Account shall be maintained by the Trustee in which shares of Company Stock received by the Trustee as dividends with respect to shares held in the Unallocated Company Stock Account or in such Stock Dividend account shall be segregated until credited to the Suspense Account.

5.6 Year End Account Adjustments. As of the least day of each Plan Year, the Participants' accounts, the Suspense Account, and the Unallocated Accounts shall be adjusted as provided in the following Sections 5.7 through 5.10.

5.7 Adjustment for Net Changes in Assets. First, the Administrative Committee shall determine the net increase or decrease in the number of shares of Company Stock and the net increase or decrease in the current fair market value of all other assets held in the Trust Fund since the first day of the Plan Year. For this purpose, all shares of Company Stock and other assets held in the Suspense Account and the Unallocated Accounts shall be excluded. Such net changes shall be credited or charged to each Participant's Company Stock Account and Investment Account in proportion to the ratio of (i) the number of shares credited to his Company Stock Account as of the first day of the Plan Year to (ii) the sum of all shares credited to all such Participants' Company Stock Accounts at such date. In the event there are no shares credited to such accounts, such net changes shall be credited or charged in proportion to the ratio of (i) the balance credited to each Participant's Investment Account as of the first day of the Plan Year to (ii) the total balances credited to all Participants' Investment Accounts at such date.

5.8 Forfeitures. Second, any shares and other amounts which are forfeited absolutely by a Participant pursuant to Section

7.5 shall be charged to the Participant's accounts and credited to the Suspense Account.

5.9 Transfers from Unallocated Accounts. Third, a portion of the shares held in the Unallocated Company Stock Account shall be credited to the Suspense Account as of the last day of the Plan Year for which contributions have been made, or earnings of the Trust Fund have been used, to satisfy a portion of a Company Stock Obligation. The number of such shares to be credited shall bear the same proportion to the total number of shares purchased in connection with such Obligation which are then held in the Unallocated Company Stock Account, as (i) the amount of the payments, including interest, on such Obligation attributable to such contributions or amounts, bears to (ii) the total remaining amount of payments, including interest to maturity, required to satisfy such Obligation (including the current year's payments). For this purpose each Company Stock Obligation and the shares purchased in connection therewith shall be considered separately. In addition, shares held in the Unallocated Stock Dividend Account shall be credited to the Suspense Account at the same time and in the same proportion that the shares in the Unallocated Company Stock Account with respect to which such shares were received are credited to the Suspense Account.

5.10 Allocations to Active Participants' Accounts. Fourth, assets credited to the Suspense Account shall be allocated

among the accounts of the Active Participants who (i) are employed by a Company on the last day of the Plan Year, (ii) have terminated employment on account of Early or Normal Retirement, death, or Disability with at least 1,000 Hours of Service in that Plan Year, or (iii) are on a Recognized Absence as of that date, in accordance with the following procedure:

5.10-1 All Company Stock credited to the Suspense Account shall be allocated in shares and fractional shares among the Company Stock Accounts of the Active Participants in proportion to the ratio of (i) the number of each Active Participant's Allocation Points to (ii) the sum of the Allocation Points of all Active Participants.

5.10-2 The remaining amounts credited to the Suspense Account shall be allocated among the Investment Accounts of the Active Participants in proportion to the ratio described in Section 5.10-1.

However, for any Top-Heavy Year, a Participant who was employed by an Employer as of the end of the year, but who had fewer than 1,000 Hours of Service, shall share equally in such allocations to a maximum allocated value equal to three percent of his Total Compensation. Further, in any Top-Heavy Year, allocations to Participants who qualify as Active Participants shall be based upon

Total Compensation until each such Participant has been allocated 3 percent of his Total Compensation.

5.11 Authority for Investment Changes. No provision of this Plan pertaining to allocation or vesting shall restrict the Investment Committee and the Trustee from making any investment decisions or dispositions of Trust assets which are for the benefit of the Participants and Beneficiaries and appropriate under an employee stock ownership plan in accordance with ERISA. Such decisions and dispositions may involve an increase, reduction or change in the assets credited to the Company Stock Accounts, the Investment Accounts, the Suspense Account, and the Unallocated Accounts.

5.12 Prohibited Allocations. Notwithstanding any other provision of this Plan, in any Plan Year beginning after December 31, 2004,during which the Company Stock held by this Plan consist of stock in an S corporation, no portion of the assets of this Plan attributable to such Company Stock may, during a "nonallocation year", accrue or be allocated directly or indirectly for the benefit of any "disqualified person". For this purpose, "nonallocation year" and "disqualified person" shall have the meanings set forth in Code section 409(p).

SECTION 6. LIMITATIONS ON CONTRIBUTIONS FOR PARTICIPANTS.

6.1 Limitation on Annual Additions. Notwithstanding the provisions of Sections 4 and 5, the annual addition to a Participant's accounts under this Plan and under any other qualified retirement plans and simplified employee pensions maintained by the Employers or an affiliate (within the purview of sections 414(b), (c), (m) and (o) and section 415 (h) of the Code, which affiliate shall be deemed an Employer for this purpose) shall not exceed for any Plan Year an amount equal to the lesser of (i) the dollar limitation currently in effect under section 415(c)(1)(A) of the Code increased, for purposes of this Section 6.1 only, for those Participants who qualify for the "Special Limitation" provided in section 415(c)(6) of the Code to the maximum amount permitted pursuant to such section 415(c)(6); or (ii) 25 percent of the Participant's Total Compensation for any such limitation year.

For purposes of this section 6, the "annual addition" to a Participant's accounts means the sum of (i) the Employer contributions and forfeitures allocated to his accounts (including, solely for purposes of the dollar limitation, contributions to any individual medical benefits account described in section 415(1)(2) and 491A(d)(2) of the Code), plus (ii) for any limitation year beginning before 1987, the lesser of one-half of the Participant's voluntary contributions credited within the limitation year, or the

excess of his after-tax contributions over six percent of his Total Compensation for that year, plus (iii) for any limitation year beginning after 1986, the Participant's total after-tax contributions for that year. The annual addition for a Participant shall include the amount of any excess contributions subsequently returned to the Participant by the Trustee pursuant to Section 6.3.

The Code section 415(b)(1)(A) and 415(c)(1)(A) dollar limitations referred to in this Section 6 shall, for each limitation year ending after 1987, be automatically adjusted to the new dollar limitations determined by the Commissioner of Internal Revenue for the calendar year beginning in that limitation year. A "limitation year" means each 12-month period beginning on January 1. Furthermore, for purposes of this Section 6, shares of Company Stock shall be valued at fair market value as determined pursuant to Section 8.13.

6.2 <u>Coordinated Limitation With Other Plans</u>. Aside from the limitation prescribed by Section 6.1 for any single limitation year, beginning before January 1, 2000, if a Participant has ever participated in one or more defined benefit plans maintained by an Employer or an affiliate, and if the Participants under any such plan have not been limited so that his defined benefit fraction does not exceed one minus his defined contribution fraction then the annual additions to his accounts shall be limited on a cumulative basis so that the sum of his defined contribution plan

fraction and his defined benefit plan fraction does not exceed one. For this purpose:

6.2-1 A Participant's "defined contribution plan fraction" with respect to a limitation year shall be a fraction, (i) the numerator of which is the sum of the annual additions to his accounts through the end of the current limitation year under all qualified retirement plans and simplified employee pensions ever maintained by an Employer (whether or not terminated) and (ii) the denominator of which is the sum of the least of the following amounts determined for the current year and each prior year of the Participant's Service with an Employer: (a) 1.25 times the Code section 415(C)(1)(A) dollar limitation, or (b) 1.0 times such dollar limitation if the Plan is either super top-heavy, or the Plan is top-heavy and the minimum benefits required pursuant to section 416(h)(2) of the Code and regulation thereto have not been provided, or (c) 35 percent of the Participant's Total Compensation for such year. However, the denominator of the defined contribution plan fraction shall be determined instead pursuant to the special transition rule set forth in section 415(e)(6) of the Code if the Administrator so elects.

If the Participant participated in any related defined contribution plan in any years beginning before 1976, any excess of the sum of the actual annual additions to the Participant's account for those years over the maximum annual additions which could have been made in accordance with Section 6.1 shall be ignored, and voluntary contributions by the Participant during those years shall be taken into account as to each such year only to the extent that his average annual voluntary contribution in those years exceeded 10 percent of his average annual Total Compensation in those years.

In the case of any Participant covered by one or more defined contribution plans established by May 6, 1986, for whom the sum of his defined contribution plan fraction and defined benefit plan fraction on the day preceding January 1, 1987, did not exceed one under the rules of section 415(e) of the Code in effect on that date but did exceed one under the rules becoming effective on January 1, 1987, his defined contribution plan fraction shall be permanently reduced by subtracting from the numerator an amount equal to the product of (a) the excess of the sum of such fractions on January 1, 1987, over one, multiplied by (b) the denominator of the defined contribution plan fraction on that date. No

changes in the terms of any plan after May 5, 1986, shall be taken into account in making such an adjustment.

6.2-2 A Participant's "defined benefit plan fraction" with respect to a limitation year shall be a fraction, (i) the numerator of which is his projected annual benefit payable at normal retirement under all defined benefit plans maintained by the Employer (whether or not terminated), and (ii) the denominator of which is the least of (a) 1.25 times the Code section 415(b)(1)(A) limitation, or (b) 1.0 times such dollar limitation if the Plan is either super top-heavy, or the Plan is top-heavy and the minimum benefits required pursuant to section 416(h)(2) of the Code and regulations thereto have not been provided, or (c) 1.4 times the Participant's average Total Compensation during his highest-paid three consecutive limitation years.

For this purpose, the projected annual benefit shall be the annual retirement benefit (adjusted to an actuarially equivalent straight life annuity if such benefit is expressed in a form other than a straight life annuity or qualified joint and survivor annuity) which the Participant will receive, assuming his Service will continue until his normal retirement age under the plan (or current age, if later), and that his compensation and

all other relevant factors used to determine benefits under the plan will remain constant through such date. A Participant's benefits for this purpose shall not include any benefits attributable to his rollover or voluntary contributions, any benefits transferred from another plan not maintained by an Employer, or any pre-retirement death benefits, post-retirement medical benefits, or post-retirement cost-of-living adjustments.

Notwithstanding the foregoing, in the case of any Participant covered on or before January 1, 1987, by one or more defined benefit plans established by May 6, 1986, which satisfied the requirements of section 415 for all years beginning before 1987, the denominator of his benefit plan fraction shall in no event be less than 125 percent of the sum of the annual benefits which he had accrued as of January 1, 1987, disregarding any changes in the terms of any plan after May 5, 1986.

6.3 Effect of Limitations. It is the intention of the Company that all contributions shall be allocated among the Participants in the proportions described in Section 5.10 to the greatest extent possible. Therefore, if the limitations prescribed in Sections 6.1 and 6.2 prevent the allocation of any amount to a Participant which would otherwise be allocable to him pursuant to Section 5.10, such amount shall be reallocated among the other

Active Participants (to the extent permitted by Sections 6.1 and 6.2) in the proportions described in Section 5.10, and any such amount remaining unallocated shall be held in the Suspense Account to be allocated as soon as possible in a subsequent Plan Year.

SECTION 7. VESTING AND FORFEITURES

7.1 Vesting in Participants' Accounts. A Participant shall have no vested interest in his Company Stock Account and Investment Account prior to the date on which he shall have completed five years of Vesting Service, at which date the Participant's interest in his accounts shall become 100 percent vested. However, in any Top-Heavy Year, any Participant who shall have completed three years of Vesting Service as of the last day of such year, shall become 100% vested in his accounts. For purposes of this Section 7.1, Vesting Service credited during a Recognized Absence shall not be counted (except as required under Section 2.22) unless the Participant resumes active Service at the end of his Recognized Absence.

7.2 Full Vesting Upon Certain Events. Notwithstanding Section 7.1, each Participant's interest in his Company Stock Account and Investment Account shall fully vest on any of the following events:

7.2-1 The Participant reaches his Normal Retirement Date while still in the employ of an Employer; or

7.2-2 The Participant's employment is terminated by death; or

7.2-3 The Participant's employment is terminated because of Disability.

7.3 Breaks in Service. For purposes of determining a Participant's vested interest in his accounts at the time of a Break in Service or a termination of his employment, his years of Vesting Service shall not include:

7.3-1 In the case of a Break in Service, any subsequent years of Service; or

7.3-2 In the case of a termination of employment, any subsequent years of Service unless there is no Break in Service between the last period of the Participant's Vesting Service preceding or including the date of such termination and the first period of any subsequent Vesting Service.

However, prior years of Vesting Service shall be counted with respect to a Participant's interest in his accounts accumulated through Service after a Break in Service.

7.4 Full Vesting Upon Plan Termination. Notwithstanding, Section 7.1, each active Employee's interest in his Company Stock Account and Investment Account shall vest in full upon termination of this Plan by the Company or upon the permanent and complete discontinuance of contributions by his Employer. In the event of a partial termination, each active Employee's interest shall fully vest with respect to that part of the Plan which is terminated.

7.5 Forfeitures. On the termination of a Participant's employment prior to the vesting of his interest pursuant to Sections 7.1 through 7.4, such non-vested interest shall be forfeited as of the last day of the Plan Year in which the termination occurs, subject to restoration as provided in Section 7.6. Notwithstanding the foregoing, a Participant who has not terminated employment shall forfeit his non-vested interest upon incurring a five-year Break in Service. Any forfeiture shall be charged to the accounts of the Participant and credited to the Suspense Account as of the last day of the Plan Year in which the forfeiture occurs.

7.6 Restoration of Forfeited Interest. If a Participant who has forfeited his interest because of termination of employment is re-employed by the Company and completes one year of Vesting Service prior to incurring a five-year Break in Service, the amount which was previously forfeited shall be restored to his accounts from the Suspense Account or by special contribution by the Company.

7.7 Vesting and Nonforfeitability. A Participant's interest under this Plan which has become vested shall thereafter be nonforfeitable for any reason.

SECTION 8. DISTRIBUTION OF BENEFITS

8.1 Form of Distribution. Any distribution of benefits pursuant to this Plan shall be made in a single lump sum payment of cash only. At the time benefits become distributable pursuant to Sections 8.2, 8.3 or 8.4 any shares credited to a Participant's Company Stock Account shall be converted by the Trustee into cash at the current fair market value and credited to the Participant's Investment Account. The entire balance in the Participant's Investment Account shall then be distributed in cash to the Participant. The shares and amounts so converted shall be charged and credited to the Participant's accounts and the Suspense Account as of the first day of the Plan year in which the distribution of his benefits commences pursuant to Sections 8.2, 8.3 or 8.4.

8.2 Retirement, Disability, Death or Attainment of Age 70-1/2. Any Participant (a) whose employment is terminated on or after his Early or Normal Retirement Date or by reason of Disability, or (b) who reaches age 70-1/2 while still an active Employee, and the Beneficiary of any Participant who dies, shall be entitled to receive the full balances credited to the Participant's accounts as of the last day of the Plan Year in which such termination, age attainment or death occurs. Subject to the provisions of Section 8.1, such benefits shall be distributed as soon as practicable (but in no event later than 60 days) after the end of such Plan Year, except as otherwise provided in Sections 8.4

or 8.5, but in no event later than one year after the end of the applicable Plan Year. Notwithstanding the foregoing, if the termination of such Participant's employment occurs before he has accumulated 1000 Hours of Service in a Plan Year, the Participant or Beneficiary shall receive the distribution in that Plan Year, based on the value of the Company Stock as of the last Valuation Date preceding the date of such election.

8.3 Other Termination. Any Participant whose employment is terminated after his interest has become vested pursuant to Section 7 and who does not qualify for the distribution of benefits under Section 8.2 shall be entitled to receive the full balances credited to his accounts as of the last day of the Plan Year in which he attains age 65 or dies, whichever is sooner, or in which he attains age 60 and he so elects or consents in writing. With respect to any Company Stock, if any, which was acquired by the Trust through Company Stock Obligations after December 31, 1986, ("post-1986 Stock") and which is credited to a Participant's Account, the Participant shall be entitled to receive a distribution as of the last day of the fifth Plan Year following his termination. Until distributed, the balances in the Participant's Company Stock Account and Investment Account shall continue to be adjusted solely in accordance with Section 5.7. Subject to the provisions of Section 8.1, such balances shall be distributed as soon as practicable (but in no event later than 60

days) after the end of the applicable Plan Year except as otherwise provided in Sections 8.4 or 8.5, but in no event later than one year after the end of such Plan Year. The Administrative Committee may in its sole discretion accelerate the time of distribution of such benefits because of the Participant's state of health or similar personal emergency or other administrative reasons; provided, however, that if the value of the Participant's Accounts exceeds (a) $3,500 with respect to a distribution prior to January 1, 1998 (taking into account any prior distributions), or (b) $5,000 with respect to a distribution after December 31, 1997, his benefits shall not be distributed before the earlier of his death or Normal Retirement Date without the Participant's written election or consent.

8.4 <u>Deferral and Timing of Benefit Payments</u>. Any Participant who becomes eligible for a benefit distribution under Sections 8.2 or 8.3, may elect to defer the distribution to a date not later than(a)the last day of the year in which he retires or (b) July 1 in the year in which he attains age 70-1/2 (whichever is later), subject to delayed payment as provided in Section 8.5, and subject to earlier distribution pursuant to the last sentence in Section 8.3. The Participant's balances shall continue to be adjusted solely in accordance with Section 5.7 until distribution pursuant to Section 8.1. A Participant may change such deferral to an earlier year upon at least 60 days written notice to the

Administrative Committee. Also, in all events, the benefits of a Participant who is a Five Percent Owner shall commence to the extent necessary to satisfy Code section 401(a)(9) by the April 1st of the calendar year following the calendar year in which he reaches age 70-1/2, and the benefits of a Participant who retires during or after the year he reaches age 70-1/2 shall commence to the extent necessary to satisfy Code section 401(a)(9) by the April 1st of the calendar year following the calendar year in which he retires, unless the Participant had attained age 70-1/2 prior to January 1, 1988, or the Participant had elected a later commencement date in an election filed on or before December 31, 1983, which complied with the applicable law.

8.5 Delay in Benefit Determination. If the Administrative Committee is unable to determine the benefits distributable to a Participant or Beneficiary on or before the date prescribed for distribution pursuant to Sections 8.2, 8.3 or 8.4, because the applicable valuation has not yet been determined or for any other reason, such benefits shall in any event be distributed not later than 60 days after the date on which such benefits can first be determined, subject to the provisions of Section 8.1, but in no event later than one year after the end of the applicable Plan Year.

8.6 Distribution to Beneficiaries. If any benefits remain distributable pursuant to this Plan after the death of a

Participant, such benefits shall be distributed to his Spouse or other chosen Beneficiary. Any Participant may designate and change his Beneficiary from time to time by giving written notice to the Administrative Committee on a form provided for this purpose. Notwithstanding the foregoing, no designation by a married participant of a Beneficiary other than his Spouse shall be valid unless the designation is accompanied by the Spouse's written consent, which must acknowledge the effect of the election and must be witnessed by the Administrative Committee, its representative or a notary public. (This requirement shall not apply if the Participant establishes to the Administrative Committee's satisfaction that the Spouse may not be located.)

8.7 Early Distribution Election. If a Participant's Company Stock Account has been credited with post-1986 Stock, as defined in Section 8.3, any such Participant who has attained age 55 and has completed 10 years of participation under the Plan (a "Qualified Participant") will have the right to elect an early distribution, under the following rules, during the five Plan Year period beginning with the Plan Year in which the Participant first becomes a Qualified Participant (the "Distribution Election Period").

Within 90 days after the close of each Plan Year in the Distribution Election Period, each Qualified Participant shall be permitted to elect to receive a cash distribution of no more than

twenty-five percent (25%) of the value of his post-1986 Stock, to the extent such value exceeds the amount to which a prior election, if any, applies. In the fifth year of the Distribution Election Period, the preceding sentence shall be applied by substituting "50%" for "25%". In lieu of receiving a distribution under this Section 8.7, a Qualified Participant may direct the Plan to transfer his distribution to another qualified plan of his Employer which accepts such transfers, provided that such plan permits employee-directed investments and does not invest in Company Stock to a substantial degree. Such distribution or transfer shall be made within 90 days after the close of the Plan Year, subject to a delay in determining value of the Company Stock as provided in Section 8.5.

8.8 Election Formalities. Any election of a benefit commencement date shall be in writing, signed by the Participant or, if applicable, by the Beneficiary, and delivered personally or by mail to the Trustee or Administrative Committee. The Administrative Committee or Trustee may provide appropriate forms for benefit elections, but an election shall be valid whether or not it is made on the official form.

8.9 Marital Status. The Administrative Committee shall from time to time take whatever steps it deems appropriate to keep informed of each Participant's marital status. Each Employer shall provide the Administrative Committee with the most reliable

information in the Employer's possession regarding its Participants' marital status, and the Administrative Committee may, in its discretion, require a notarized affidavit from any Participant as to his marital status. The Administrative Committee, the Plan, the Trustee, and the Employer shall be fully protected and discharged from any liability to the extent of any benefit payments made a result of the Administrative Committee's good faith and reasonable reliance upon information obtained from a Participant as to his marital status.

8.10 Accounting for Benefit Distributions. Any benefit distribution shall be charged to the accounts of the Participant as of the first day of the Plan Year in which such distribution is made.

8.11 Option to Have Company Purchase. If any Company Stock has been or is distributed to any person, either from the Plan or by reason of a Participant's or Beneficiary's death, such person shall have the right, exercisable by written notification to the Company at any time within 5 months after such distribution, to require the Company to purchase such shares at their fair market value. Such right may also be exercised in the Plan Year next following the Plan Year in which the distribution has been made, but no later than 60 days after the date on which the Investment Committee determines the fair market value of the Company Stock to be effective for such following Plan Year. At the time such right

is exercisable, the Trustee, at the discretion of the Investment Committee, may assume the Company's rights and obligations with respect to such purchase. The purchaser, in its sole discretion, may determine to effect such purchase on an installment basis with payments (including interest at the lesser of (i) 12% per annum or (ii) 80% of the prevailing rate established pursuant to section 6621 of the Code to be made over a period not to exceed the earlier of (i) 10 years from the date of purchase (but no more than five years with respect to post-1986 Stock, as defined in Section 8.3), or (ii) the date that all Company Stock Obligations incurred with respect to such shares have been paid. Furthermore, with respect to any such post-1986 Stock, the purchaser shall provide adequate security and must begin payments within 30 days of the Participant's or Beneficiary's exercise of his right to sell.

Notwithstanding the foregoing, no person shall have such a right with respect to that portion of the Company Stock distributed which can be sold through any public market without restrictions at the time of distribution in accordance with then applicable federal and state securities laws and regulations. Nothing contained herein shall be deemed to obligate the Company to register any Company Stock under any federal or state securities law or to create a public market to facilitate distribution of such Stock. The option herein described may only be exercised by such person as is described herein (or his personal representative) and

may not be transferred either separately or together with such Stock to any other person, and such option shall continue in effect to the extent provided herein in the event that this Plan ceases to be a qualified employee stock ownership plan. Except as provided in this Section 8.11 or the following Section 8.12 or by other applicable law, no Company Stock may be subject to a put, call or other option, or buy-sell or similar arrangement while held by and when distributed from this Plan, whether or not this Plan is then a qualified employee stock ownership plan.

8.12 Right of First Refusal. Except as provided in Section 8.11, any Participant, Beneficiary, or other person to whom shares of Company Stock have been distributed (including a personal representative of a Participant, Beneficiary, or other person) shall, prior to any sale or other transfer of such shares (whether voluntary, involuntary, or by operation of law, and whether for consideration or gratuitous), first offer such shares to the Company in writing at their current fair market value, and then, if refused by the Company, to the Trustee. If the Company has not accepted such offer within 30 days after its delivery to the Company, the stockholder must similarly offer such shares to the Trustee. If the Trustee has not accepted such offer within 30 days after its delivery to the Trustee, the shares shall be transferable subject to all then applicable federal and state securities laws and regulations. For this purpose, a bona fide written offer

received from a prospective buyer shall be deemed to be the fair market value of such shares. If a shorter period of time is required by law for the exercise of the right or first refusal than is provided in this Section, such shorter prior shall be applicable.

8.13 Valuation. Unless otherwise specified, the fair market value of Company Stock for purposes of any transaction under this Section 8, shall be the value determined by the Investment Committee as of the last Valuation Date preceding the date of the transaction.

8.14 Direct Transfers. Notwithstanding any provision of the Plan to the contrary that would otherwise limit a distributee's election, a distributee may elect, at the time and in the manner prescribed by the Administrative Committee to have any portion of an eligible rollover distribution paid directly to an eligible retirement plan specified by the distributee in a direct rollover. For this purpose:

(i) An eligible rollover distribution is any distribution of all or any portion of the balance to the credit of the distributee, except that an eligible rollover distribution does not include: any distribution that is one of a series of substantially equal periodic payments (not less frequently than annually) made for the life (or life expectancy) of the distributee or the joint lives

(or joint life expectancies) of the distributee and the distributee's designated beneficiary, or for a specified period of ten years or more, any distribution to the extent such distribution is required under section 401(a)(9) of the Code, and any portion of any distribution that is not includable in gross income (determined without regard to the exclusion for net unrealized appreciation with respect to employer securities).

(ii) An eligible retirement plan is an individual retirement account described in section 408(a) of the Code, an individual retirement annuity plan described in section 408(b) of the Code, an annuity plan described in section 403(a) of the Code, or a qualified trust described in section 401(a) of the Code that accepts the distributee's eligible rollover distribution. However, in the case of an eligible rollover distribution to the surviving Spouse, an eligible retirement plan is an individual retirement account or individual retirement annuity.

(iii) A distributee includes an Employee or former Employee. In addition, the Employee's or former Employee's Spouse or former Spouse who is the alternate payee under a qualified domestic relations order, as

defined in section 414(p) of the Code, are distributees with regard to the interest of the Spouse or former Spouse.

(iv) A direct rollover is a payment by the Plan to the eligible retirement Plan specified by the distributee.

## SECTION 9. RULES GOVERNING BENEFIT CLAIMS AND REVIEW REVIEW OF APPEALS

9.1 Claim for Benefits. Any Participant or Beneficiary qualifying for the distribution of benefits under this Plan may file a claim for such benefits with the Administrative Committee on a form of application provided by the Committee. In the case of any Participant or Beneficiary who fails to file a claim on or before the date prescribed for distribution, he shall be presumed to have filed a claim on such prescribed date for the immediate distribution of the balance credited to the Participant's accounts in cash according to the records of the Administrative Committee.

9.2 Notification by Committee. Within 90 days after receipt of any claim for benefits (or within 180 days if special circumstances require an extension of time and written notice of the extension is given to the Participant or Beneficiary within 90 days after receiving the claim for benefits), the Administrative Committee shall notify the Participant or Beneficiary whether the claim has been approved or denied. If the Committee denies a claim in any respect, the Committee shall set forth in a written notice to the Participant or Beneficiary:

(i) each specific reason for such denial;

(ii) specific reference to the pertinent Plan provisions on which the denial is based;

(iii) a description of any additional material or information which could be submitted by the

Participant or Beneficiary to support his claim, with an explanation of the relevance of such information; and

(iv) an explanation of the claims review procedure set forth in Section 9.3.

9.3 Claims Review Procedure. Within 60 days after a Participant or Beneficiary receives notice from the Committee that his claim for benefits has been denied in any respect, the Participant or Beneficiary may file with the Committee a written notice of appeal setting forth his reasons for disputing the Committee's determination. In connection with such appeal, the Participant or Beneficiary or his representative may inspect or purchase copies of pertinent documents and records to the extent not consistent with other Participants' and Beneficiaries' rights of privacy. Within 60 days after receiving such a notice of appeal from a prior determination (or within 120 days, if special circumstances require an extension of time and written notice of the extension is given to the Participant or Beneficiary and his representative within 60 days after receiving the notice of appeal), the Administrative Committee shall furnish to the Participant or Beneficiary and his representative, if any, a written statement of the Committee's final decision with respect to his claim, including the reasons for such decision and the particular Plan provisions upon which it is based. Notwithstanding

the foregoing, the receipt of benefits under the Plan shall not be dependent upon the filing of a claim.

## SECTION 10. THE ADMINISTRATIVE COMMITTEE AND THE INVESTMENT COMMITTEE

10.1 Authority of Administrative Committee. The Administrative Committee shall constitute the "plan administrator" within the meaning of ERISA and shall have exclusive responsibility and authority to control and manage the operation and administration of the Plan, including the interpretation and application of its provisions, except to the extent such responsibility and authority are otherwise specifically (i) allocated to the Company, the Trustee, or the Investment Committee under the Plan and Trust Agreement, (ii) delegated to other persons by the Company, the Administrative Committee, the Trustee, or the Investment Committee, or (iii) allocated to other parties by operation of law. The Administrative Committee shall have no investment responsibility with respect to the Trust Fund. The Administrative Committee has the authority to amend the Plan pursuant to Section 11.3. In the discharge of its duties, the Administrative Committee shall be authorized to employ accountants, legal counsel, and other agents (who also may be employed by the Company in the same or some other capacity) and to pay their reasonable expenses and compensation.

10.2 Member of Administrative Committee. The Administrative Committee shall consist of three or more individuals who shall be selected by the Board. Any person, including but not limited to a director, shareholder, officer or employee of the

Company, shall be eligible to serve on the Administrative Committee. The Board shall designate which individual is to be the chairman and which individual is to be the secretary of the Committee. The Board also shall have the power to remove any member of the Administrative Committee at any time without cause and without notice. The Board shall notify the Trustee of any change in the membership of the Administrative Committee.

10.3 Duties of Secretary. The secretary shall keep such records as may be necessary to implement the Plan and shall furnish such reports as may be required from time to time by the Administrative Committee. The secretary shall also furnish to the Trustee and the Investment Committee such information as may be necessary to properly administer the Trust. Further, the secretary shall see that the Administrative Committee prepares, files and distributes such forms and materials as are prescribed by law.

10.4 Actions by Administrative Committee. All actions of the Administrative Committee shall be governed by a majority vote of its members. Its members may meet informally and may take any action without the necessity of meeting as a group. In the event of a vacancy on the Administrative Committee, the remaining members shall act by majority agreement until the vacancy is filled.

10.5 Execution of Documents. Any instrument executed by the Administrative Committee shall be signed by any two members of the Committee.

10.6 Adoption of Rules. The Administrative Committee shall adopt such rules and regulations of uniform applicability as it deems necessary or appropriate for the proper administration and interpretation of the Plan.

10.7 Responsibilities to Participants. The Administrative Committee shall determine which Employees are eligible to participate in the Plan. The Administrative Committee shall furnish to each such Employee such materials and forms as may be required by law or for the proper administration of this Plan. The Administrative Committee also shall determine when, under the terms of this Plan, a Participant or his Beneficiary qualifies for the distribution of such benefits in the proper form and amount from the assets of the Trust Fund. Each Participant shall be entitled to any and all rights which a Participant must have for the Plan to be and remain qualified under sections 401(a) and 409(e) of the Code, effective January 1, 1980; and the Administrative Committee shall be responsible for the implementation of reasonable procedures to allow the Participants to exercise any such rights. The Administrative Committee shall exercise in good faith its authority to approve or disapprove any elections by Participants and Beneficiaries under this Plan which are subject to its

approval, and may decide in its sole discretion to permit modifications of election terms to the extent consistent with applicable law.

10.8 Establishment of Participant's Accounts. The Administrative Committee shall maintain on its records for each Participant such separate Company Stock and Investment Accounts as may be necessary with respect to his participation in the Plan. Any such account shall terminate upon the distribution in full of all benefits distributable under this Plan with respect to such Participant and his Beneficiary, or upon forfeiture of the balance credited to any such account.

10.9 Authority of Investment Committee. The Investment Committee shall have exclusive responsibility and authority to determine the investment of the Trust Fund with respect to Company Stock and to direct the Trustee's exercise of powers with respect to the purchase, retention, sale, pledge, or voting of Company Stock and the repayment of Company Stock Obligations.

Notwithstanding the foregoing, with respect to Company Stock acquired by the Trust on or after January 1, 1980, each Participant and/or Beneficiary shall be entitled to direct the Investment Committee as to the voting of any voting shares of such Company Stock allocated to his Company Stock Account, except that if any such Company Stock was not acquired through a loan which utilized the partial income exclusion under Code Section 133, then

the Participant and/or Beneficiary shall be entitled to direct the Investment Committee as to the voting of such shares, only with respect to any vote required for the approval or disapproval of any corporate merger or consolidation, recapitalization, reclassification, liquidation, dissolution, sale of substantially all the assets of a trade or business, or other similar transactions prescribed by regulation. Any unallocated shares held by the Trust and any shares which are not voted by direction of the Participants and Beneficiaries shall be voted by the Trustee as directed by the Investment Committee in its sole discretion.

10.10 Membership of Investment Committee. The Investment Committee shall consist of three or more individuals selected by the Board. Any person, including but not limited to a member of the Administrative Committee, a director, shareholder, officer of employee of the Company, shall be eligible to serve on the Committee. The Board shall designate which individual is to be the chairman and which individual is to be the secretary of the Investment Committee. The Board also shall have the power to remove any member of the Investment Committee at any time, without cause and without notice. The Board shall notify the Trustee and the Administrative Committee of any change in the membership of the Investment Committee.

10.11 Investment Policy and Implementation. The investment policy of this Plan shall be primarily to invest in and

hold Company Stock for the exclusive benefit of the Participants and their Beneficiaries. The Investment Committee shall adopt such guidelines as it deems necessary or appropriate for the implementation of this policy and for the proper discharge of its duties under the Plan. In determining the proper investment of the Trust Fund in Company Stock, the Investment Committee shall be authorized to employ investment counsel, legal counsel, appraisers, and other agents and to pay their reasonable expenses and compensation.

10.12 Actions by Investment Committee. All actions of the Investment Committee shall be governed by a majority vote of its members. Its members may meet informally and may take any action without the necessity of meeting as a group. In the event of a vacancy on the Investment Committee, the remaining members shall act by majority agreement until the vacancy is filled.

10.13 Execution of Documents. Any instrument executed by the Investment Committee and all instructions to the Trustee shall be signed by any two members of the Investment Committee.

10.14 Valuation of Company Stock. The Investment Committee shall determine in its best judgment the fair market value of the Company Stock from time to time as necessary for the purposes of this Plan. For this purpose, the Investment Committee shall rely upon the appraisal of an appraiser who is independent of

the Company and the Employers and who meets the requirements of the regulations promulgated under Code section 170(a)(1).

10.15 Compliance with ERISA. Each member of the Administrative Committee and the Investment Committee shall discharge his duties in good faith and in accordance with the applicable requirements of ERISA and shall perform all acts necessary to comply with such Act.

10.16 Compensation and Indemnification by Company. The Company shall pay each member of the Administrative Committee or the Investment Committee such reasonable compensation for his services as may be determined by the Board of Directors and shall fully reimburse such member for expenses incurred in connection with performing his duties. Further, a member shall be indemnified and held harmless by the Company to the fullest extent permitted by law against any and all costs, damages, expenses, and liabilities reasonably incurred by or imposed upon the member in connection with any claim made against him or in which he may be involved by reason of his being, or having been, a member of either committee, to the extent such amounts are not satisfied by insurance.

SECTION 11. ADOPTION, AMENDMENT OR TERMINATION OF THE PLAN

11.1 Adoption of Plan by Other Employers. With the consent of The Okonite Company, Inc., any entity may become a participating Employer under the Plan by (i) taking such action as shall be necessary to adopt the Plan, (ii) becoming a party to the Trust Agreement establishing the Trust Fund, and (iii) executing and delivering such instruments and taking such other action as may be necessary or desirable to put the Plan into effect with respect to the entity's employees.

11.2 Adoption of Plan by Successor. In the event that any Employer shall be reorganized by way of merger, consolidation, transfer of assets or otherwise, so that an entity other than an Employer shall succeed to all or substantially all of the Employer's business, the successor entity may be substituted for the Employer under the Plan by adopting the Plan and becoming a party to the Trust Agreement. Contributions by the Employer shall be automatically suspended from the effective date of any such reorganization until the date upon which the substitution of the successor entity for the Employer under the Plan becomes effective. If, within 90 days following the effective date of any such reorganization, the successor entity shall not have selected to become a party to the Plan, or if the Employer shall adopt a plan of complete liquidation other than in connection with a reorganization, the Plan shall be automatically terminated with

respect to Employees of the Employer as of the close of business on the 90th day following the effective date of the reorganization, or as of the close of business on the date of adoption of a plan of complete liquidation, as the case may be.

11.3 Right to Amend or Terminate. The Company intends to continue the Plan as a permanent program. However, each participating Employer reserves the right to suspend, supersede, or terminate the Plan at any time and for any reason, as it applies to that Employer's Employees, and The Okonite Company, Inc. specifically reserves the right to amend, suspend, supersede, merge, consolidate, or terminate the Plan at any time and for any reason, as it applies to the Employees of all Employers. Such action by an Employer or the Company shall be by corporate resolution or unanimous consent of the Board of Directors of the Employer or the Company, as the case may be. Furthermore, the Administrative Committee may amend the Plan by action of the Committee without the necessity of Board action. No such amendment, suspension, supersession, merger, consolidation, or termination of the Plan shall affect adversely any vested right of a Participant or a Beneficiary, or shall divert any portion of the Trust Fund to purposes other than the exclusive benefit of the Participants and their Beneficiaries prior to the satisfaction of all liabilities under the Plan. Moreover, no transfer of assets to a successor plan or merger or consolidation with another plan shall

be effected unless, in the event of the termination of the successor plan or the surviving plan immediately following such transfer, merger, or consolidation, each Participant or Beneficiary would receive a benefit equal to or greater than the benefit he would have received if the plan in which he was previously a Participant or Beneficiary had terminated immediately prior to such transfer, merger, or consolidation. Upon termination of the Plan, the Trustee and the Investment Committee shall relinquish all rights in and to any assets of the Plan which remain pledged as collateral on the date of termination pursuant to a Company Stock Obligation, but only to the extent necessary to satisfy such Company Stock Obligation. Following the termination of this Plan, the Trustee shall continue to administer the Trust and distribute benefits therefrom in accordance with the terms of the Plan as amended from time to time and the Administrative Committee's instructions.

11.4 Plan Restatement Subject to Qualification. In the event that this restated Plan is held by the Internal Revenue Service not to qualify under section 401(a) of the Code, this Plan may be amended retroactively to the earliest date permitted in accordance with U.S. Treasury regulations in order to secure qualification under section 401(a). In the event that this restated Plan is amended after its initial qualification and the Plan as amended is held by the Internal Revenue Service not be

qualify under section 401(a), such amendment may be modified retroactively to the earliest date permitted by U.S. Treasury regulations in order to secure approval of the amendment under section 401(a).

SECTION 12. MISCELLANEOUS PROVISIONS

12.1 Plan Creates No Employment Rights. Nothing contained in this Plan shall be construed or interpreted as granting to any Employee the right to be retained as an Employee by an Employer, or as limiting or affecting the rights of an Employer to control its Employees or to terminate the employment of any Employee at any time and for any reason.

12.2 Nonassignability of Benefits. No assignment, pledge, or other anticipation of benefits from the Plan will be permitted or recognized by an Employer, the Company, the Administrative Committee, or the Trustee. Moreover, benefits from the Plan shall not be subject to attachment, garnishment, or other legal process for debts or liabilities of any Participant or Beneficiary, to the extent permitted by law. This prohibition on assignment of alienation shall apply to any judgment, decree, or order (including approval of a property settlement agreement) which relates to the provision of child support, alimony, or property rights to a present or former spouse, child or other dependent of a Participant pursuant to a State domestic relations or community property law, unless the judgment, decree, or order is determined by the Administrative Committee to be a qualified domestic relations order within the meaning of section 414(p) of the Code.

12.3 Limit of Employer Liability. The liability of an Employer under this Plan shall be limited to making voluntary

contributions to the Trust from time to time in accordance with Section 4.2. Participants and Beneficiaries shall look solely to the Trust Fund for the payment of any benefits.

12.4 Treatment of Expenses. All expenses incurred by the Administrative Committee, the Investment Committee and the Trustee in connection with administering this Plan and the Trust Fund shall be paid by the Trustee from the Trust Fund to the extent the expenses have not been paid or assumed by the Employers of by the Trustee.

12.5 Number and Gender. Any use of the singular herein shall be interpreted to include the plural and the plural the singular. Any use of the masculine, feminine or neuter shall be interpreted to include the masculine, feminine or neuter, as the context shall require.

12.6 Nondiversion of Assets. Except as provided in Section 4.3, under no circumstances shall any portion of the Trust Fund be diverted to or used for any purpose other than the exclusive benefit of the Participants and their Beneficiaries prior to the satisfaction of all liabilities under the Plan.

12.7 Incapacity to Receive Benefits. If the Administrative Committee determines at any time that a person qualifying for the distribution of benefits under this Plan is a minor or is incompetent, the Committee shall have the power to cause the benefits becoming due under the Plan to be distributed,

in the case of a minor, to such person's parents, legal guardian, or to a custodian for such person under the Uniform Gifts to Minors Act, or, in the case of an incompetent, to such person's spouse, parents, or legal guardian, such distribution to be used for such person's benefit. Neither the Administrative Committee nor the Trustee shall be obligated to inquire as to the actual use of the distribution by the person to whom it is made under this Section 12.7, and any such distribution shall operate as a complete discharge of the obligations of the Trust Fund, the Trustee, the Investment Committee, the Administrative Committee and the Employer.

12.8 Separability of Provisions. If any provision of this Plan is held to be invalid or unenforceable, the other provisions of the Plan shall not be affected thereby but shall be applied as if the invalid or unenforceable provision had not been included in the Plan.

12.9 Service of Process. The agent for the service of process against the Plan shall be the secretary of the Administrative Committee, or such other person as may be designated from time to time by the Company.

12.10 Governing State Law. This Plan shall be interpreted in accordance with the laws of the State of New Jersey to the extent those laws are applicable under the provisions of ERISA.



# EXHIBIT B

Amendment to The Okonite Company, Inc.
Employees' Stock Ownership Plan
Effective January 1, 2002

WHEREAS, The Okonite Company, Inc. (the "Company") adopted THE OKONITE COMPANY, INC. EMPLOYEES' STOCK OWNERSHIP PLAN (the "Plan") effective January 1, 1976; and

WHEREAS, in Section 11.3, the Company reserved the right to amend the Plan; and

WHEREAS, the Company has authorized its officers to adopt such amendments to the Plan so as to comply with current rules and regulations with respect to the qualification of the Plan;

NOW THEREFORE, the Plan is amended effective as of January 1, 2002 or such other dates as are specifically provided herein, as follows:

1. Section 2, definition of Key Employee – is replaced with the following language:

   "Key Employee" shall mean any employee who at any time during the Plan Year, which includes the determination date, was (i) an officer of the employer having annual compensation greater than $130,000 (as adjusted under section 416(i)(1), (ii) a 5 percent owner of the employer, (iii) a 1 percent owner having annual compensation of more than $150,000. For this purpose, an Employee's "Total Compensation" shall include any amount which is excludable from the Employee's gross income for tax purposes pursuant to Section 125, 402(e)(3), 402(h)(1)(B) or 403(b) of the Code. In determining which individuals are Key Employees, the rules of Section 416(i) of the Code and Treasury Regulations promulgated thereunder shall apply. The Beneficiary of a Key Employee shall also be considered a Key Employee."

2. Section 2, definition of Top Heavy Year, paragraph (d) is amended to include the following:

"The accrued benefits and accounts of any individual who has not performed services for the employer during the 1-year period ending on the determination date shall not be taken into account, except that in the case of a distribution made for a reason other than severance from employment, death or disability, this provision shall be applied by substituting 5-year period for 1-year period.

The present values of accrued benefits and the amounts of account balances of an employee as of the determination date shall be increased by the distributions made with respect to the employee under the plan and any plan aggregated with the plan under section 416(g)(2) of the Code during the 1-year period ending on the determination date. The preceding sentence shall also apply to distributions under a terminated plan which, had it not been terminated, would have been aggregated with the plan under section 416(g)(2)(A)(i) of the Code. In the case of a distribution made for a reason other than separation from service, death, or disability, this provision shall be applied by substituting "5-year period" for "1-year period."

The employer may provide in the adoption agreement of another defined contribution plan that the minimum benefit requirement shall be met in that plan (including another plan that consists solely of a cash or deferred arrangement which meets the requirements of section 401(k)(12) of the Code and matching contributions with respect to which the requirements of section 401(m)(11) of the Code are met)."

3. The first paragraph of Section 6.1 is amended to read:

"6.1 Limitation on Annual Additions. Notwithstanding the provisions of Sections 4 and 5, the annual addition to a Participant's accounts under this Plan and under any other qualified retirement plans and simplified employee pensions maintained by the Employers or an affiliate (within the purview of sections 414(b), (c), (m) and (o) and section 415(h) of the Code, which affiliate shall be deemed an Employer for this purpose) shall not exceed for any limitation year an amount equal to the lesser of (i) $40,000 as adjusted for increases to cost-of-living under section 415(d) of the Code, increased, for purposes of this Section 6.1 only, for those Participants who qualify for the "Special Limitation" provided in section 415(c)(6) of the Code to the maximum amount permitted pursuant to such section 415(c)(6); or (ii) 100 percent of the Participant's Total Compensation for any such limitation year."

4. Section 8.14 is amended to read as follows:

"8.14 Direct Transfers. Notwithstanding any provision of the Plan to the contrary that would otherwise limit a distributee's election, a distributee may elect, at the time and in the manner prescribed by the Administrative Committee to have any portion of an eligible rollover distribution paid directly to an eligible retirement plan specified by the distributee in a direct rollover. For this purpose:

(i) An eligible rollover distribution is any distribution of all or any portion of the balance to the credit of the distributee, except that an eligible rollover distribution does not include: any distribution that is one of a series of substantially equal periodic payments (not less frequently than annually) made for the life (or life expectancy) of the distributee or the joint lives (or joint life expectancies) of the distributee and the distributee's designated beneficiary, or for a specified period

of ten years or more, any distribution to the extent such distribution is required under section 401(a)(9) of the Code, and any portion of any distribution that is not includable in gross income (determined without regard to the exclusion for net unrealized appreciation with respect to employer securities). For purposes of the direct rollover provisions in section 8.14 of the plan, any amount that is distributed on account of hardship shall not be an eligible rollover distribution and the distributee may not elect to have any portion of such a distribution paid directly to an eligible retirement plan.

(ii) An eligible retirement plan is an individual retirement account described in section 408(a) of the Code, an individual retirement annuity plan described in section 408(b) of the Code, an eligible plan described in Section 457(b) of the Code, an annuity plan described in section 403(a) of the Code, or a qualified trust described in section 401(a) of the Code that accepts the distributee's eligible rollover distribution. However, in the case of an eligible rollover distribution to the surviving Spouse, an eligible retirement plan is an individual retirement account or individual retirement annuity.

(iii) A distributee includes an Employee or former Employee. In addition, the Employee's or former Employee's Spouse or former Spouse who is the alternate payee under a qualified domestic relations order, as defined in section 414(p) of the Code, are distributees with regard to the interest of the Spouse or former Spouse.

(iv) A direct rollover is a payment by the Plan to the eligible retirement Plan specified by the distributee.

IN WITNESS WHEREOF, the Company has caused this instrument to be executed by its duly authorized officers this 30th day of December, 2002.

ATTEST:

THE OKONITE COMPANY, INC.

By: ______________________
David J. Sokira, Vice President

AMENDMENT TO
THE OKONITE COMPANY
EMPLOYEES' STOCK OWNERSHIP PLAN
EFFECTIVE JANUARY 1, 2007

WHEREAS, The Okonite Company (the "Company") adopted THE OKONITE COMPANY, INC. EMPLOYEES' STOCK OWNERSHIP PLAN (the "Plan") effective January 1, 1976; and

WHEREAS, in Section 11.3, the Company reserved the right to amend the Plan; and

WHEREAS, the Company amended the Plan effective January 1, 1997, by restating it in its entirety; and

WHEREAS, the Company has determined to further amend the Plan to conform to new vesting requirements and rollover provisions;

NOW THEREFORE, the Plan is amended effective January 1, 2007 as follows:

Section 7.1 of the Plan is deleted and replaced with the following language:

7.1 Vesting in Participants' Accounts. A Participant shall have no vested interest in his Company Stock Account and Investment Account prior to the date on which he shall have completed three years of Vesting Service, at which date the Participant's interest in his accounts shall become 100 percent vested. For purposes of this Section 7.1, Vesting Service credited

during a Recognized Absence shall not be counted (except as required under Section 2.22) unless the Participant resumes active Service at the end of his Recognized Absence.

Section 8.14(iii) of the Plan is amended by adding the following sentence:

Furthermore, a Beneficiary who is entitled to a death benefit pursuant to Section 8.8 hereof shall also be treated as a distributee hereunder.

IN WITNESS WHEREOF, the Company has caused this instrument to be executed by its duly authorized representative on this 10 day of APRIL, 2007.

ATTEST:

[signature]

THE OKONITE COMPANY

By: [signature]
David J. Sokira
Vice President

# AMENDMENT FOR FINAL 415 REGULATIONS THE OKONITE COMPANY, INC. EMPLOYEES' STOCK OWNERSHIP PLAN

This Amendment to the Plan reflects certain provisions of the Final Regulations under Code Sections 415 and is intended as good faith compliance with the requirements of the Final Regulations. To the extent that any other provision of the Plan is inconsistent with the provisions of this amendment, the provisions of this amendment govern.

1. This amendment shall be effective for Limitation Years beginning on or after July 1, 2007 by the addition of the following:

   A. Total Compensation (hereinafter referred to as "415 Compensation") shall include certain remuneration paid within 2½ months after a Participant's severance of employment if such compensation (within the meaning of Code section 415(c)(3)) is paid after such Participant's severance of employment, provided such Compensation is:

      (i) Payments that, absent a severance from employment, would have been paid to the Participant while in Service and which represent regular compensation for regular working hours, compensation for services outside regular working hours (such as overtime or shift differential), commissions, bonuses, or other similar compensation; or

      (ii) Payments for accrued bona fide sick, vacation, or other leave, but only if the Participant would have been able to use the leave if employment had continued, or

      (iii) Payments for Service rendered during a Limitation Year but not paid during that Limitation Year solely because of the timing of pay periods and pay dates (administrative delay, "the first few weeks rule") if:

         (a) These amounts are paid during the first few weeks of the next Limitation Year;

         (b) The amounts are included on a uniform and consistent basis with respect to all similarly situated Employees; and

         (c) No compensation is included in more than one Limitation Year.

   B. Other post-severance payments are not compensation. Any payment that is not described in this section is not considered 415 Compensation if paid after severance from employment, even if it is paid within 2½ months following severance from employment. Thus, for example, 415 Compensation shall **not** include the following:

(i) Post-severance payments to an individual who does not currently perform services for the Employer by reason of qualified military service (as that term is used in Code section 414(u)(1)) to the extent those payments do not exceed the amounts the individual would have received if the individual had continued to perform services for the Employer rather than entering qualified military service.

(ii) Compensation paid to a Participant who is permanently and totally disabled (as that term is used in Code section 22(e)(3).

(iii) Amounts paid after severance from employment that are severance pay, unfunded nonqualified deferred compensation, or parachute payments.

C. The Definition of Annual Addition is modified as follows:

(i) Restorative payments. A restorative payment that is allocated to a Participant's Account does not give rise to an annual addition for any Limitation Year. For this purpose, restorative payments are payments made to restore losses to the Plan resulting from actions by a fiduciary for which there is reasonable risk of liability for breach of a fiduciary duty under Title I of ERISA, where Plan Participants who are similarly situated are treated similarly with respect to the payments. Generally, payments to a defined contribution plan are restorative payments only if the payments are made in order to restore some or all of the Plan's losses due to an action (or a failure to act) that creates a reasonable risk of liability for such a breach of fiduciary duty (other than a breach of fiduciary duty arising from failure to remit contributions to the plan). This includes payments to the Plan made pursuant to a Department of Labor order, the Department of Labor's Voluntary Fiduciary Correction Program, or a court-approved settlement, to restore losses to a qualified defined contribution plan on account of the breach of fiduciary duty (other than a breach of fiduciary duty arising from failure to remit contributions to the Plan). However, payments made to the Plan to make up for losses due merely to market fluctuations and other payments that are not made on account of a reasonable risk of liability for breach of a fiduciary duty under Title I of ERISA are contributions that give rise to annual additions and are not restorative.

(ii) Other Amounts. The term "annual additions" does not include:

(a) Direct transfer from a qualified plan to this Plan.

(b) Rollover contributions (as described in Code sections 401(a)(31), 402(c)(1), 403(a)(4), 403(b)(8), 408(d)(3), and 457(e)(16)).

(c) Repayments of Participant loans;

(d) Repayments of amounts described in Code section 411(a)(7)(B) (in accordance with Code section 411(a)(7)(C)) and Code section 411(a)(3)(D) or repayment of contributions to a governmental plan as described in Code section 415(k)(3); or

(e) Employee contributions to a qualified cost of living arrangement within the meaning of Code section 415(k)(2)(B).

(f) Change of Limitation Year. Once established, the Limitation Year may be changed only by amending the Plan. Any change in the Limitation Year must be a change to a twelve -month period commencing with any day within the current Limitation Year. For purposes of this section 6, the limitations of Code section 415 are to be applied in the normal manner to the new Limitation Year.

(g) Excess Annual Additions. The correction mechanism for handling excess annual additions shall be in accordance with the Employee Plans Compliance Resolution System (EPCRS) or any superseding guidance.

(h) Aggregation and Disaggregation of Plans.

(iii) All defined contribution plans (without regard to whether a plan has been terminated) ever maintained by the Employer (or a predecessor employer) under which the Participant receives annual additions are treated as one defined contribution plan. For purposes of Code section 415 and the regulations, a former employer is a predecessor employer with respect to a participant in a plan maintained by an employer if the employer maintains a plan under which the participant had accrued a benefit while performing services for the former employer, but only if that benefit is provided under the plan maintained by the employer. In addition, with respect to an employer of a participant, a former entity that antedates the employer is a predecessor employer with respect to the participant if, under the facts and circumstances, the employer constitutes a continuation of all or a portion of the trade or business of the former entity. This will occur, for example, where formation of the employer constitutes a mere formal or technical change in the employment relationship and continuity otherwise exists in the substance and administration of the business operations of the former entity and the employer.

(iv) Midyear aggregation. Two or more defined contribution plans that are not required to be aggregated pursuant to Code section 415(f) and the regulations thereunder as of the first day of a Limitation Year do not fail to satisfy the requirements of Code section 415 with respect to a participant for the Limitation Year merely because they are aggregated later in that Limitation

Year, provided that no annual additions are credited to the Participant's Account after the date on which the plans are required to be aggregated."

Additional Amendment to Plan

2. Effective with respect to all distributions made on or after January 1, 2006, Section 11.12 of the Plan shall be amended by the addition of non-spouse beneficiary rollover provisions as follows:

"A non-spouse beneficiary may elect to have any portion of a distribution that exceeds $200 paid directly (trustee-to-trustee transfer) to an eligible retirement plan as described under Code Section 408(a), or an Individual Retirement Account (IRA) that is established for the purpose of receiving the distribution on behalf of a designated beneficiary who is a non-spouse beneficiary. The IRA must be established in a manner that identifies it as an IRA with respect to a deceased individual and also identifies the deceased individual and the beneficiary. The IRA of the non-spouse beneficiary is treated as an inherited IRA within the meaning of Code Section 408(d)(3)(C).The distribution is not subject to the direct rollover requirements of Code Section 401(a)(31), the notice requirements of Code Section 402(f), or the mandatory withholding requirements of Code Section 3405(c). A direct rollover to an IRA on behalf of a trust may be made where the trust is the named beneficiary of the decedent, provided the beneficiaries of the trust meet the requirements to be designated beneficiaries within the meaning of Code Section 401(a)(9)(E)."

This amendment shall be effective for Plan Years beginning after July 31, 2007, unless otherwise indicated herein.

IN WITNESS WHEREOF, the Company has caused this instrument to be executed by its duly authorized officers this 30th day of December, 2008.

ATTEST:

THE OKONITE COMPANY, INC.

By:____________________
David J. Sokira, Vice President

Amendment to The Okonite Company, Inc.
Employees' Stock Ownership Plan
Effective January 1, 2009

WHEREAS, The Okonite Company, Inc. (the "Company") adopted The Okonite Company, Inc. Employees' Stock Ownership Plan (The "Plan") effective January 1, 1976; and

WHEREAS, in Section 11.3, the Company reserved the right to amend the Plan and has amended the Plan from time to time; and

WHEREAS, the Company has authorized its officers to adopt such amendments to the Plan so as to comply with current rules and regulations with respect to the qualification of Plan;

NOW THEREFORE, the Plan is amended effective as of January 1, 2009 or such other dates as are specifically provided herein, as follows:

1. The definition of Total Compensation in Section 2 is amended by the addition of the following:

"For years beginning after December 31, 2008, (i) a Participant receiving a differential wage payment, as defined by Code section 3401(h)(2), shall be treated as an Employee of the Employer making the payment, (ii) the differential wage payment shall be treated as compensation, and (iii) the Plan shall not be treated as failing to meet the requirements of any provision described in Code section 414(u)(1)(C) by reason of any contribution or benefit which is based on the differential wage payment. However, subsection (iii) applies only if all Employees of the Employer performing service in the uniformed services as described in Code section 3401(h)(2)(A) are entitled to receive differential wage payments (as defined in Code section 3401(h)(2)) on reasonably equivalent terms and, if eligible to participate in a retirement plan maintained by the Employer, to

make contributions based on the payments on reasonably equivalent terms (taking into account Code sections 410(b)(3), (4), and (5))."

2. Section 8.2 is amended by the addition of the following:

"In the case of a death occurring on or after January 1, 2007, if a Participant dies while performing qualified military service (as defined in Code section 414(u)), the survivors of the Participant are entitled to any additional benefits (other than benefit accruals relating to the period of qualified military service) provided under the Plan as if the Participant had resumed and then terminated employment on account of death."

3. The Minimum Distribution Requirements under the Plan are amended by the addition of the following:

"Notwithstanding any provisions to the contrary, a Participant or Beneficiary who would have been required to receive required minimum distributions for 2009 ('2009 RMDs') but for the enactment of Code section 401(a)(9)(H), and who would have satisfied that requirement by receiving distributions that are (1) equal to the 2009 RMDs or (2) one or more payments in a series of substantially equal distributions (that include the 2009 RMDs) made at least annually and expected to last for the life (or life expectancy) of the Participant, the joint lives (or joint life expectancy) of the Participant and the Participant's Beneficiary, or for a period of at least 10 years (extended 2009 RMDs), will not receive those distributions for 2009 unless the Participant or Beneficiary elects to receive such distributions. However, such Participants and Beneficiaries will be given the opportunity to elect to receive the distributions described in the preceding sentence."

4. Section 8.14 is amended by (a) the addition of the following to paragraph (iii):

"A non-Spouse Beneficiary shall also be distributee".

and (b) the addition of the following as paragraph (v):

"For distributions made after December 31, 2007, a Participant or Beneficiary may elect to have any Plan distribution that is a qualified rollover distribution as defined in Code section 408A(e) directly transferred to a Roth IRA as provided in Code section 408A(d)."

5. Section 12.2 is amended by the addition of the following:

"Effective April 6, 2007, a domestic relations order that otherwise satisfies the requirements for a qualified domestic relations order ('QDRO') will not fail to be a QDRO: (i) solely because the order is issued after, or revises, another domestic relations order or QDRO; or (ii) solely because of the time at which the order is issued, including issuance after the annuity starting date or after the Participant's death. Such a domestic relations order shall be subject to the same requirements and protections that apply to QDROs."

IN WITNESS WHEREOF, the Company has caused this instrument to be executed by its duly authorized officers this 30th day of December, 2009.

ATTEST: THE OKONITE COMPANY, INC.

By:____________________
David J. Sokira, Vice President


EXHIBIT C

# AMENDMENT FOR MANDATORY DISTRIBUTION REQUIREMENT
# THE OKONITE COMPANY, INC. EMPLOYEES' STOCK OWNERSHIP PLAN

I, David J. Sokira, Vice President of The Okonite Company, pursuant to the authority granted to me by the Board of Directors of that Company to amend The Okonoite Company, Inc. Employees' Stock Ownership Plan (thePlan") so as to enable the Plan and the Trust which implements it to qualify under Section 401(a) of the Internal Revenue Code of 1986 and to enable such Trust to be exempt from taxation under Section 501(a) of the Code, do hereby amend the Plan as follows:

The last sentence of Section 8.3 shall be amended to read as follows:

> " The Administrative Committee may in its sole discretion accelerate the time of distribution of such benefits because of the Participant's state of health or similar personal emergency or other administrative reasons; provided, however, that if the value of the Participant's accounts exceeds (a) $5,000 with respect to a distribution after December 31, 1997 and prior to March 28, 2005, or (b) $0 with respect to a distribution on or after March 28, 2005, his benefit shall not be distributed before the earlier of his death or Normal Retirement Date without the Participant's written election or consent."

This Amendment is effective as of January 1, 2005.

**THE OKONITE COMPANY**

Dated: March 13, 2006

By: ______________________
David J. Sokira, Vice President



# EXHIBIT D

THE OKONITE COMPANY
HILLTOP ROAD
RAMSEY, NEW JERSEY 07446

ERNEST W. MEZGER
DIRECTOR
TREASURY OPERATIONS

July 1, 2010

Mr. William Fike
1563 Thomas Ave.
San Francisco, CA 94124

Dear Mr. Fike:

The Value of your ESOP Balance as of December 31, 2009 is as follows:

| | |
|---|---|
| Number of Shares: | 3,882.8954 |
| Value per Share: | $24.60 |
| Total Value: | $95,519.23 |

I have enclosed a beneficiary form and a return envelope for your convenience.

Very truly yours,

Ernest W. Mezger

EWM:jm
415





# EXHIBIT E

**From:** Dave Sokira <sokira@okonite.com>
**To:** WLFIKE@aol.com
**Subject:** Re: (no subject)
**Date:** Thu, Aug 26, 2010 12:55 pm

---

Question 1)You would have the option of a partial or lump sum payment with a 20% federal tax deduction.No tax would be due on any amount rolled over to an IRA account until withdrawn from that account.Proceeds are reported on a 1099.Payment would come from PNC bank.You would receive instructions regarding your options prior to payment.The answer is the same for the second condition.The beneficiary would have to contact Okonite and send a copy of the death certificate.Payments are made in December. ----- Original Message -----

> **From:** WLFIKE@aol.com
> **To:** sokira@okonite.com
> **Sent:** Thursday, August 26, 2010 1:32 AM
> **Subject:** (no subject)
>
> To: Dave Sokira
>
> Reference: William Fike's retirement account 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
>
> My parents may be willing to lend me some money based on me signing over my ESOP check when it comes in four years or my death listing them as beneficiaries.
>
> The first condition is should I live for four years questions:
>
> 1. What is the tax position? Are the proceeds 1099 or w-2? Are there any guidelines for mandatory withholdings or is it elective? Does this include social security and California State tax.
> 2. What form is the payment made? Is it a single check? If so what bank will it be drawn on?
>
> The second condition is an early payout in the event of death.
>
> 1. What are the conditions? In some cases, a death benefit is not taxed. Since this is a retirement account, please answer the same questions as in 1 and 2 of the above.
>
> William Fike
>
> 8/25/2010





# EXHIBIT F

The Okonite Company
David Sokira
102 Hilltop Road
Ramsey New Jersey

Mr. Sikora,

William Fike was advised in an email from you to send in his death certificate in November and the money would be sent in December. You have requested an original. It is attached. Jodi from your office contacted Mr. Fike's family and questioned them about the circumstances. He has not spoken to his family in twenty years. How dare she do such a thing? His family is homophobic and AIDS phobic and is not involved other than a next of kin on a form. Do not contact them again.

Attached is an original copy

If this does not suit your proposes you will find a retainer agreement to the largest law firm in San Francisco –Winston & Strawn. This firm will represent Mr. Fike's interest in his retirement account should you not fund his account. Your plan has not been updated in over 25 years and is not in accordance with California law. Mr. Fike' estate prefers not to engage the Okonite Company in litigation over this matter. For the record, PG&E is adjacent to Winston & Strawn building and is The Okonite Company's largest account.

The litigation will bring publicity at the level of the Bay Area Reporter and the San Francisco Chronicle. The Okonite Company's position that Mr. Fike -"send in his beneficiary form" as a response to a person with AIDS facing homelessness with two dogs and no ability to pay for his medications and who has $95,000 in an account that he earned and is past the age of 55, retirement age in California, is perhaps the most insensitive statement ever made by a company. It won't play well in the courts in San Francisco or at PG&E.

William L. Fike - 2010 Revocable Trust
1563 Thomas Avenue
San Francisco CA 94124


EXHIBIT G

# WINSTON & STRAWN LLP

BEIJING
CHARLOTTE
CHICAGO
GENEVA
HONG KONG
LONDON
LOS ANGELES

101 CALIFORNIA STREET
SAN FRANCISCO, CALIFORNIA 94111-5802

+1 (415) 591-1000

FACSIMILE +1 (415) 591-1400

www.winston.com

MOSCOW
NEW YORK
NEWARK
PARIS
SAN FRANCISCO
SHANGHAI
WASHINGTON, D.C.

December 17, 2010

**JAMES P. BAKER**
(415) 591-6828
jpbaker@winston.com

**BY FAX**

Francis T. Giuliano
Vice President and General Counsel
The Okonite Company
102 Hilltop Road
Ramsey, New Jersey 07446
201-825-0300 Fax 201-825-3524
info@okonite.com

Re: **William L. Fike**

Dear Mr. Giuliano:

I am very sorry to learn of Mr. Fike's death. Please note that Trust document referenced in your December 16, 2010 letter was not enclosed.

As you may know, I was retained by Mr. Fike on a *pro bono* basis in accordance with Winston's agreement with the AIDS Legal Referral Service. The purpose of my retention was to assist Mr. Fike in obtaining retirement benefits from the Okonite Employee Stock Ownership Plan.

Since I am Mr. Fike's attorney for other purposes, I do not know who Mr. Fike's ESOP beneficiary might be. I am forwarding your letter for processing to Amy Orgain, Staff Attorney, HIV/AIDS Insurance Protection Project, AIDS Legal Referral Panel, 1663 Mission Street, Suite 500, San Francisco, CA 94103 (415) 701-1200 ext. 302, (415) 701-1400 fax, in the hope that she may have this information. Ms. Orgain will be out of her office until December 27, 2010, but should be in contact with you upon her return.

Very truly yours,

James P. Baker

cc: Amy Orgain, Esq.

SF:299246.1



# EXHIBIT H

Winston And Strawn LLP
101 California 94111

Attention: Jim Baker
Reference: William Fike/Okonite Retirement Account
FAX- 415-591-1400

Mr. Baker,

I have not died. Based on a suggestion by Mr. Sokira of the Okonite Company in a phone call and email, that I send in my death certificate this early December 2010 and Okonite would send me my ESOP money in late December, I did just that. This practice – "of sending in a death certificate in December"- was done each year by the Regional Vice Presidents at The Okonite Company to receive Christmas bonuses from these accounts. It was a standing joke as to how our V.P. H.R. Stewart would die and would he do a good job on his certificate. I sent a theatrical version of my certificate to Okonite in early December and Mr. Sokira's assistant Jody sent me a note asking for an original copy. I made another one up and signed it myself and sent that one in. In the meantime she called my family in Memphis announcing I was dead from AIDS trying to confirm it and upset them terribly. This is also why I did not contact you to handle this matter for me. I did not want to use your resources when I believed this action would accomplish the funding.

I sent Okonite a note after they called my sister and told advised if this death certificate did not work, I would sue them and attached a copy of the Winston and Strawn agreement. There are also numerous examples of Okonite funding this money before the age of 60. Alan Winders, Blair Murray, Larry Forrestor (Maybe dead from HIV). I formed a revocable trust and made it the beneficiary and have an account at Wells Fargo. I signed the letter to the Okonite Company from the revocable trust of William Fike. The trust has been formed. The taxes were also to be deducted from the proceeds of my account from Okonite and sent directly 20% to Federal and 10% to the State of California.

Attached- Letter to Sokira
Letter from Okonite

William Fike
415-666-5311

The Okonite Company
David Sokira
102 Hilltop Road
Ramsey New Jersey

Mr. Sikora,

William Fike was advised in an email from you to send in his death certificate in November and the money would be sent in December. You have requested an original. It is attached. Jodi from your office contacted Mr. Fike's family and questioned them about the circumstances. He has not spoken to his family in twenty years. How dare she do such a thing? His family is homophobic and AIDS phobic and is not involved other than a next of kin on a form. Do not contact them again.

Attached is an original copy

If this does not suit your proposes you will find a retainer agreement to the largest law firm in San Francisco –Winston & Strawn. This firm will represent Mr. Fike's interest in his retirement account should you not fund his account. Your plan has not been updated in over 25 years and is not in accordance with California law. Mr. Fike' estate prefers not to engage the Okonite Company in litigation over this matter. For the record, PG&E is adjacent to Winston & Strawn building and is The Okonite Company's largest account.

The litigation will bring publicity at the level of the Bay Area Reporter and the San Francisco Chronicle. The Okonite Company's position that Mr. Fike -"send in his beneficiary form" as a response to a person with AIDS facing homelessness with two dogs and no ability to pay for his medications and who has $95,000 in an account that he earned and is past the age of 55, retirement age in California, is perhaps the most insensitive statement ever made by a company. It won't play well in the courts in San Francisco or at PG&E.

William L. Fike - 2010 Revocable Trust
1563 Thomas Avenue
San Francisco CA 94124

THE OKONITE COMPANY
HILLTOP ROAD
RAMSEY, NEW JERSEY 07446

DAVID J. SOKIRA
VICE PRESIDENT - FINANCE AND TREASURER

November 24, 2010

To the Estate of William Fike
Attn: Darrell Fike
1563 Thomas Avenue
San Francisco, CA 94124

Dear Mr. Fike:

We have received a copy of the death certificate for William Fike. However, we need an original certificate.

We must receive the original certificate promptly so we can process the ESOP Distribution prior to year end. If the Distribution is not made by December 31st then the payment will be delayed until June of 2011.

Very truly yours,

DJS:jm
10.931



# EXHIBIT I

# WINSTON & STRAWN LLP

BEIJING
CHARLOTTE
CHICAGO
GENEVA
HONG KONG
LONDON
LOS ANGELES

101 CALIFORNIA STREET
SAN FRANCISCO, CALIFORNIA 94111

+1 (415) 591-1000

FACSIMILE +1 (415) 591-1400

www.winston.com

MOSCOW
NEW YORK
NEWARK
PARIS
SAN FRANCISCO
SHANGHAI
WASHINGTON, D.C.

**JAMES P. BAKER**
415-591-6828
jpbaker@winston.com

April 18, 2011

**VIA FEDERAL EXPRESS**

The Okonite Company's Employee's Stock
Ownership Plan Administrative Committee
c/o David J. Sokira, Secretary
The Okonite Company
102 Hilltop Road
Ramsey, New Jersey 07446

**Re: Request for a Plan Distribution on Behalf of William L. Fike**

Dear Mr. Sokira:

The law firm of Winston & Strawn represents Mr. William Fike in connection with his participation in the Okonite Company Employee's Stock Ownership Plan ("Plan"). Mr. Fike would like to take a distribution of his Plan benefits. Plan Section 8.3 states:

> With respect to any Company stock, if any, which was acquired by the Trustee through Company Stock obligations after December 31, 1986, ("post-1986 Stock") and which is credited to a Participant's Account, the Participant shall be entitled to receive a distribution as of the last day of the fifth Plan Year following his termination.

Please send me the appropriate distribution election forms that Mr. Fike needs to complete at your earliest convenience. Mr. Fike would also like for you to provide him with an estimate of the amount of the "post-1986 Stock" in his Account.

Mr. Fike is seriously ill with HIV. His illness has devastated his finances. It also makes it very difficult for him to stay employed. Could you please also provide me with the standards the Plan uses for making distributions because of a "Participant's state of health or similar

personal emergency?" *See* Amendment for Mandatory Distribution Requirement dated January 1, 2005.

Thank you in advance for your kind consideration of these requests.

Very truly yours,

James P. Baker

JPB:bt

cc: William Fike

SF:307585.1


EXHIBIT J

GDE&T GREENBERG DAUBER EPSTEIN & TUCKER | COUNSELLORS AT LAW
A PROFESSIONAL CORPORATION

STANLEY A. EPSTEIN

April 20, 2011

James P. Baker, Esq
Winston & Strawn, LLP
101 California Street
San Francisco, CA 94111-5802

Re: William Fike/Okonite Company Employees' Stock Ownership Plan

Dear Mr. Baker:

I have been asked to respond to your letter of April 18, 2011 sent to The Okonite Company's Employee's Stock Ownership Plan ("Plan") Administrative Committee. I must commend you on reviewing the Plan documents so thoroughly; however, I must still advise you that Mr. Fike is not entitled to any payment from the Plan at this time.

The Trustee did not acquire any Company Stock through Company Stock obligations after December 31, 1986, so that there is no "post-1986 Stock" in the Plan. As you can see from the Plan document, it was adopted in 1976, and there were no later Company Stock obligations incurred. Therefore Mr. Fike has no "post -1986 Stock" in his Account that can be distributed.

Furthermore, the Administrative Committee has determined in its sole discretion, as allowable under the Mandatory Distribution Amendment, not to make early distribution on account of any Participant's state of health. The Committee does not want to undertake the administrative burden of ascertaining the health status of terminated Participants or their financial ability to pay for their own healthcare or obtain government health benefits. Mr. Fike himself illustrates the difficulty that would be incurred in assessing the validity of documents sent to back up health claims, since he previously sent a fake death certificate.

Very truly yours,

Stanley A. Epstein

cc: David J. Sokira

Suite 600, One Gateway Center, Newark, New Jersey 07102 | Tel: 973.643.3700 | Fax: 973.643.1218
Email: sepstein@greenbergdauber.com | Web: www.greenbergdauber.com


EXHIBIT K

WINSTON & STRAWN LLP

BEIJING
CHARLOTTE
CHICAGO
GENEVA
HONG KONG
LONDON
LOS ANGELES

101 CALIFORNIA STREET
SAN FRANCISCO, CALIFORNIA 94111

+1 (415) 591-1000

FACSIMILE +1 (415) 591-1400

www.winston.com

MOSCOW
NEW YORK
NEWARK
PARIS
SAN FRANCISCO
SHANGHAI
WASHINGTON, D.C.

**JAMES P. BAKER**
415-591-6828
jpbaker@winston.com

May 4, 2011

**VIA FEDERAL EXPRESS**

David Sokira, Secretary
The Okonite Company, Inc. Administrative Committee
for the Okonite Company Employee's Stock Ownership Plan
102 Hilltop Road
Ramsey, New Jersey 07446
sokira@okonite.com

**Re: Information Request in Connection With the Appeal of William Fike's Denied Claim for Immediate Distribution of Okonite Company Employee's Stock Ownership Plan Account**

Dear Mr. Sokira:

I write in response to Mr. Epstein's letter dated April 20, 2011, which I received on April 25, 2011. Mr. Epstein states that he was asked to respond to Mr. Fike's claim on behalf of The Okonite Company's Employee's Stock Ownership Plan ("Plan") Administrative Committee ("Committee"). In an abundance of caution, I am following the procedure outlined in the Summary Plan Description and am sending you Mr. Fike's request for additional information so he can timely appeal the denial of his claim. I am also sending Mr. Epstein a copy of this letter. Page 10 of the Summary Plan Description states that "you or your lawyer may inspect or purchase copies of any relevant materials from the files and records of the Plan and the Administrative Committee."

Please provide Mr. Fike with the evidence the Committee relied on in deciding that no Company stock was acquired through "Company Stock Obligations" after December 31, 1986. "Company Stock Obligations" are defined at Plan section 2.13 to mean "obligations arising from any extension of credit to the Trust for the purposes of purchasing Company Stock." Please also provide me with any and all documents or any other evidence that confirms Mr. Epstein's statement that after 1976 no Company Stock Obligations were incurred.

Mr. Fike also asked for a distribution of his account in accordance with Plan section 8.3. It states in pertinent part:

> The Administrative Committee may in its sole discretion accelerate the time of distribution of such benefits because of the Participant's state of health or similar personal emergency or other administrative reasons . . . .

In denying Mr. Fike's claim, Mr. Epstein concluded:

> Furthermore, the Administrative Committee has determined in its sole discretion, as allowable under the Mandatory Distribution Amendment, not to make early distribution on account of any Participant's state of health. The Committee does not want to undertake the administrative burden of ascertaining the health status of terminated participants or their financial ability to pay for their own health care or other government health benefits . . . .

Mr. Fike asks the Administrative Committee to provide him with additional information so he can draft a proper appeal of the Committee's decision denying his claim.

Please provide a written response to the following questions:

1. Please identify the Plan provision giving the Committee the power to override the Plan's express terms based on administrative burden.

2. Has the Committee ever previously exercised its discretion to suspend Plan distributions under Plan section 8.3? If yes, please identify the date and the reason for taking said action.

3. Has the Committee ever previously exercised its discretion to override an express Plan term based on its "administrative burden?"

4. If it has, please identify the Plan provision, the date and the reason for taking the action.

5. Why was the amendment to Plan section initially 8.3 adopted? Was the first participant to receive a distribution under amended Plan section 8.3 a highly compensated employee, a 5 percent owner, a highly paid employee or in the top paid group?

6. Please identify the types of evidence the Committee has relied on in granting Plan distribution requests under section 8.3.

7. Please also identify the types of evidence the Committee has relied on in denying distribution requests under section 8.3.

8. Please explain why the Committee now believes Plan participants' distribution requests under section 8.3 are too burdensome for the Committee's consideration.

9. Please explain why denying all Participant distribution requests for poor health or similar personal emergency is in the best interests of the Plan's participants and beneficiaries.

10. How does the Committee's decision to issue a blanket denial for all distributions requests under Plan section 8.3 square with the Committee's fiduciary duty to act "solely in the interests of the Participants and beneficiaries for the exclusive purpose of: (i) providing benefits to participants . . . . (D) in accordance with the documents and instruments governing the plan?" *See* 29 U.S.C. § 1104(a).

In order to properly present his appeal Mr. Fike needs to better understand how Plan section 8.3 works. Please provide me with certain facts about each and every distribution made pursuant to this Amendment from January 1, 2005 to the present. Please set forth the following information concerning Plan Section 8.3:[1]

1. The date of each distribution;

2. The total number of distributions made;

3. The total number of denied distribution requests;

4. Please identify each date a Participant received a distribution on account of the Participant's state of health;

5. Please identify each date a Participant distribution request was denied on account of the Participant's state of health;

6. Please identify each date a Participant's distribution request on account of a personal emergency was approved;

7. Please identify each date a Participant distribution request was denied on account of not being a personal emergency;

8. Please identify each date a Participant received a distribution for "other administrative reasons;"

9. Please identify each date Participant distribution request was denied for "other administrative reasons;"

10. Please state the total number of distributions made pursuant to Plan section 8.3 for each Plan year;

[1] Unless otherwise indicated all information requests are for the time period from January 1, 2005 to the present.

11. Please state the number of distributions made in accordance with section 8.3 for each plan year identifying the date the distribution was made as well as the total number of highly compensated employees receiving distributions on each date;

12. Was any Participant who received a distribution from January 1, 2005 to the present a "5-percent owner" within the meaning of Plan section 2.20? If yes, please identify the date and the amount of the distribution;

13. Was any Participant who received a Plan section 8.3 distribution after January 1, 2005 a "highly paid employee," within the meaning of Plan section 2.21. If yes, please identify the date and the amount of the distribution;

14. Was any Participant who received a distribution under Plan section 8.3 after January 1, 2005 in the "top paid group" within the meaning of Plan section 2.21(b). If yes, please identify the date and the amount of the distribution.

15. Please identify by date and amount any Participant received a distribution of his or her account in accordance with Plan section 8.3 for "Other Administrative Reasons" from January 1, 2005 to the present. Please identify by date and the amount of the Plan distribution any Participant who received a distribution for "Other Administrative Reasons" and who was a highly compensated employee, a highly paid employee, a 5 percent owner, or was in the "top paid group." If yes, please also describe how the Committee's rationale for the "other administrative reasons" determination;

16. Please identify by date and amount any Participant who received a Plan section 8.3 distribution due to the state of the Participant's health from January 1, 2005 to the present. Please identify by date and the amount of the Plan distribution any Participant who received a distribution for "state of health" reasons and who was a highly compensated employee, a highly paid employee, a 5 percent owner, or who was in the top paid group. If a "state of health" distribution was made please state the specific reasons articulated by the Committee for making the distribution. If a "state of health" distribution was not made please state the specific reasons articulated by the Committee for denying the distribution. Please also identify all the types of documents considered by the Committee in making "state of health" distribution determinations.

17. Please identify by date and amount any Participant who received a distribution for a "personal emergency" in accordance with Plan section 8.3 from January 1, 2005 to the present. Please identify by date and the amount of the Plan distribution, each Participant who received a distribution for a "personal emergency" and who was a highly compensated employee, a highly paid employee, and 5 percent owner, or who was in the top paid group. For each such distribution, please set forth the specific reasons the Committee stated in granting or in denying the

distribution requests. Please also identify any and all documents considered in making this determination;

18. Please identify each member of the Administrative Committee. Plan section 10.4 indicates that "all actions of the Administrative Committee shall be governed by majority vote of its members." Please provide me with a copy of the minutes of the meeting at which Mr. Fike's claim was considered. Please identify the documents the Committee relied on or considered in making its decision to deny Mr. Fike's claim. If the Committee did not meet to review or decide Mr. Fike's claim, please explain what steps it took to ensure Mr. Fike's claim received a "full and fair review" as required by 29 U.S.C. § 1133(2). Please also provide me with a complete copy of Mr. Fike's claim file. Please also let me know on what date the Administrative Committee met to discuss Mr. Fike's claim and whether all Committee members voted to deny his claim; and

19. Has any Participant, aside from Mr. Fike, been denied a distribution under section 8.3? If yes, please provide me with the date of the denial and the Committee's specific reasons supporting the denial.

Please let me know what information the Committee requires for it to decide if Mr. Fike qualifies for a distribution under Plan Section 8.3 due to his "state of health or similar personal emergency or other administrative reasons."

Thank you in advance for your kind consideration of Mr. Fike's information requests in support of his soon to be filed appeal. Because Mr. Fike must file his appeal on or before June 29, I ask the Committee to provide responses to these information requests on or before May 20, 2011. A check in the amount of $50 is enclosed to cover the cost of making copies. I look forward to your prompt response.

Very truly yours,

James P. Baker

JPB:bt

Enclosure

c: Stanley Epstein, Esq.
William Fike



# EXHIBIT L



GREENBERG DAUBER EPSTEIN & TUCKER

COUNSELLORS AT LAW

A PROFESSIONAL CORPORATION

STANLEY A. EPSTEIN

RECEIVED
2011
Winston & Strawn LLP

May 27, 2011

James P. Baker, Esq
Winston & Strawn LLP
101 California Street
San Francisco, CA 94111

Re: William Fike/Okonite Company Employees' Stock Ownership Plan

Dear Mr. Baker:

Mr. Sokira asked me to respond to your letter of May 4, 2011. You asked for evidence that no Company stock was acquired through "Company Stock Obligations" after December 31, 1986. Frankly, I do not know how you provide evidence of something that never happened. Mr. Sokira has been an Officer and Director of the company during the relevant period and would certainly know if the ESOP or the company incurred any such obligations. You have his assurance that no such obligation was incurred.

With respect to Section 8.3, this is not in any way a requirement that a benefit be paid out before death or Normal Retirement Date. It is a restriction against making such a payment, at the discretion of the Administrative Committee, without the Participant's consent. No payment has ever been made to a Participant, with or without consent, pursuant to Section 8.3. Under these circumstances, your questions with respect to Section 8.3 are not relevant.

Very truly yours,

Stanley A. Epstein

Stanley A. Epstein

cc: David J. Sokira

Suite 600, One Gateway Center, Newark, New Jersey 07102 | Tel: 973.643.3700 | Fax: 973.643.1218
Email: sepstein@greenbergdauber.com | Web: www.greenbergdauber.com